UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SEKUK GLOBAL ENTERPRISES, On Behalf
of Itself And All Others Similarly Situated,

v. C.A. No. 04-306ML

KVH INDUSTRIES, INC., MARTIN A. KITS
VAN HEYNINGEN, and PATRICK J.
SPRATT

**MEMORANDUM AND ORDER**

This class action was instituted by Teamsters Affiliate Pension Plan, Irving S. Braun, and Judith Braun (collectively, the "Plaintiffs") on behalf of all purchasers of KVH securities from October 1, 2003 through July 2, 2004 (the "Class Period") against Defendants KVH Industries, Inc. ("KVH"), Martin A. Kits van Heyningen ("Kits van Heyningen"), and Patrick J. Spratt ("Spratt"). Plaintiffs allege that Defendants made numerous fraudulent misstatements and omissions in connection with the sale of KVH securities and thereby violated various federal securities laws. This case is now before the Court on Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint. For the reasons set forth below, Defendants' motion is granted in part and denied in part.

## I. FACTS

The following facts are taken from the complaint and are recounted in the light most

favorable to Plaintiffs, as required on a motion to dismiss. Baron v. Smith, 380 F.3d 49, 51 (1st Cir. 2004).

Defendant KVH, a Rhode Island corporation that is publicly traded on the NASDAQ National Market, develops and produces mobile communication and navigation products that employ mobile satellite antennae and fiber optic technologies. At all times relevant to this action, Defendant Kits van Heyningen served as KVH's Chief Executive Officer, President, and Director, while Defendant Spratt acted as KVH's Chief Financial Officer. KVH derives its revenue from three principal sources: (1) defense products, such as tactical navigation products for military applications; (2) legacy navigation products; and (3) mobile satellite communication products, such as satellite television antenna systems for passenger vehicles and recreational vehicles ("RVs").

In May 2001, KVH announced that it had raised $19.5 million from private equity financings, which it ultimately used to fund a number of research initiatives. A significant portion of these funds went towards research efforts for photonic fiber technology in high-speed telecommunications networks. These efforts were abandoned in the middle of 2002 after they failed to produce any commercially feasible applications. The funds also financed the company's "Mobile Broadband" program, which sought to develop a low-profile satellite television antenna for passenger vehicles. Unlike the photonic fiber technology development efforts, the Mobile Broadband program successfully produced a marketable product, the TracVision A5 mobile antenna unit (the "A5"), which enabled users to receive satellite television signals in their cars.

KVH heralded the A5 and its anticipated impact on the company's fortunes in the months prior to its expected launch in the third quarter of 2003. In a January 9, 2003 press release, Kits

van Heyningen stated that "[f]or the first time, a satellite TV antenna offers a rugged, flat design suitable for the family SUV, mini-van, or car at an affordable price." (Compl. ¶ 30.) The company went on to note that the A5 "has reached the market just as the backseat video entertainment market is exploding." (Id.) On May 14, 2003, KVH issued another press release claiming that the A5 was "being introduced just as mobile video systems have become the hottest selling automotive electronic accessory on the market today." (Id. ¶ 32(b).) One financial analyst, Needham & Company, Inc., predicted that the A5 would increase KVH's available market tenfold and result in annual revenues of approximately $50 million.

As KVH trumpeted the unveiling of the A5 in early 2003, it simultaneously faced decreasing revenues in other areas of its business. KVH had historically obtained its highest profit margins from sales of defense products. Over the course of 2003 and into 2004, however, its defense revenue declined sharply. KVH reported defense product revenue of over $6 million in the fourth quarter of 2002, but this figure dropped to under $4 million by the third quarter of 2003. By the second quarter of 2004, defense product revenue dipped below $2 million.

At the same time that KVH's defense revenue was in decline, its satellite product revenue increased dramatically, due largely in part to the debut of the A5. The A5 was introduced to the automotive market in September 2003 with a retail price of $3,495 per unit. According to KVH press releases, 150 A5 units were shipped by the end of September and 1,700 were sold during the entire fourth quarter of 2003, leading KVH to describe the launch of the A5 as "the most successful product launch and fastest sales ramp of any product in the company's history." (Id. ¶ 60.) Consequently, while KVH reported less than $6 million in satellite product revenue in the fourth quarter of 2002, this figure had increased to over $9 million by the third quarter of 2003.

It reached a peak of nearly $14 million in the first quarter of 2004. During this time, KVH noted that the sales of the A5 represented approximately thirty percent of its satellite communication revenue.

In addition to reporting increasing satellite product revenue, KVH reported continually increasing overall quarterly revenue upon the introduction of the A5. For the third quarter of 2003, the first quarter in which the A5 was commercially available, KVH announced revenue of $13.5 million, which resulted in a net loss of $0.16 per share. This strong performance led the price of its common stock to reach a high of approximately $33.00 per share on or about November 25, 2003. In the fourth quarter of 2003, KVH reported a "record" quarterly revenue of $15.7 million, leading to a net loss of $0.14 per share. This record was soon eclipsed in the first quarter of 2004 when KVH reported $18 million in income, which generated net income of $0.01 per share.

During the period from late 2003 through early 2004 when KVH introduced the A5 and reported increasing revenue, KVH undertook a secondary public offering of common stock (the "Secondary Offering") in order to generate additional capital. After filing a shelf registration for 3 million shares on November 26, 2003, KVH officially announced on January 22, 2004 that it planned to offer 2.25 million shares for sale in the Secondary Offering. By the time that KVH completed the Secondary Offering on February 13, 2004, it had issued 2.75 million shares of common stock at a price of $18.75 per share, providing the company with more than $51.5 million in proceeds.

This period of continued growth came to an end in the second quarter of 2004. On July 6, 2004, KVH announced expected second quarter revenues of $14.5 million, which represented a

19% decline from the prior quarter. KVH simultaneously announced that it was immediately reducing the retail unit price of the A5 by 34%, from $3,495 to $2,295, and that it intended to write off over $2.4 million in inventory costs. These events led to an estimated loss of $0.34 to $0.37 per share. As a result, the price of KVH common stock fell by almost 24% on the day of the announcement, dropping from $12.50 to $9.51 per share on July 6, 2004. KVH later reported that second quarter 2004 satellite product revenue, which totaled $12.3 million, declined more than 11% from the prior quarter and reached its lowest point since the second quarter of 2003. Spratt, in a July 6, 2004 press release, originally attributed this drop in revenue to "lower than expected sales for [KVH's] military navigation products and land mobile satellite systems...." (Id. ¶ 79.) Kits van Heyningen later stated that the company's disappointing financial results were due to "an unusual convergence of factors [including] a channel inventory adjustment by one of [KVH's] major RV customers, potential key military programs where purchasing decisions have been delayed, and fiber optic product orders that were rescheduled for the third quarter rather than in the second." (Id. ¶ 81.) KVH's satellite product revenue continued to suffer declines in the third quarter of 2004, tumbling more than 17% from the second quarter figures to a total of $10.3 million.

According to Plaintiffs, Defendants should have anticipated this rapid decline in overall revenue and satellite product revenue because, during the Class Period, "KVH was artificially inflating its reported financial results through a variety of improper accounting practices related to its 'sales' of A5s." (Id. ¶ 37.) Plaintiffs allege that Defendants: (1) improperly recognized revenue on "fictitious or bogus sales" and shipments of the A5 (Id. ¶ 41); (2) engaged in various acts of channel stuffing, including the waiver of shipping costs, the granting of unconditional

rights of return, the revocation of credit restrictions, and the issuance of price concessions; and (3) shipped what they knew to be defective A5s.

A. Fictitious Sales

Plaintiffs contend that, throughout the Class Period, KVH recorded revenue on fictitious sales of the A5, which resulted in the artificial inflation of both its satellite product revenue and its overall revenue.

Plaintiffs allege that on one specific occasion at the end of the fourth quarter of 2003, KVH shipped two or three truckloads of A5 units to a customer that had not ordered any. An unnamed former KVH order entry and logistics administrator claims that rather than following KVH's typical operating procedure of submitting written purchase orders, a KVH salesperson verbally presented this order to the order entry staff. A number of unnamed former KVH employees, including this administrator, as well as a former shipping manager, and a former sales coordinator, report that this shipment was made late in the fourth quarter and was returned to KVH early in the first quarter of 2004 after the customer refused to accept delivery. According to the order entry and logistics administrator, returned goods typically would re-enter KVH's active inventory immediately upon their return. However, these two or three truckloads of returned A5 units were stored in a trailer on the KVH lot for six weeks prior to being restored into inventory. The identity of the customer that received these shipments is unclear; one source identifies Featherlite, Inc. as the customer in question, while another names Stag Parkway. Plaintiffs' counsel calculates that these two or three truckloads, if packed full as described by the former shipping manager, would have contained approximately 200 to 300 A5 units, constituting approximately seventeen percent of all A5 units sold during the fourth quarter of 2003. (Id. ¶

42.)

Plaintiffs allege that this one incident is representative of KVH's greater practice of shipping undocumented orders at the end of a quarter, only to have those orders be returned in the beginning of the next quarter. An unnamed former KVH shipping and receiving clerk recounts that during the final week of a quarter, Bruce Costa, the KVH executive in charge of inventory, shipping, and receiving, often counted the inventory remaining in stock. Soon after his count was completed, an order would be placed for those units in the leftover inventory. This inventory would be moved into a trailer that would either remain in the KVH yard or be hauled away by a freight carrier, ABF Freight Systems. The former shipping manager also alleges that trailer companies frequently would be paid to store KVH products for a short period at the end of a quarter, during which time the products were recorded as revenue. These products subsequently would be returned to KVH in the first few weeks of the following quarter.

B. Channel Stuffing

In addition to the allegations of fictitious sales, Plaintiffs maintain that Defendants inflated revenue by engaging in "aggressive sales practices" known as "channel stuffing." (Id. ¶ 46.) "Channel stuffing" is the process of "inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company. It has the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." Greebel v. FTP Software, Inc., 194 F.3d 185, 202 (1st Cir. 1999). Plaintiffs assert that KVH practiced channel stuffing by entering into a number of different undisclosed "side agreements" with customers in order to induce accelerated orders. (Compl. ¶ 47.)

One such side agreement alleged by Plaintiffs is the waiver of shipping costs. According to the unnamed former KVH shipping manager, KVH had a policy of recovering its shipping costs. However, this manager claims that KVH departed from this policy by entering into verbal agreements with some customers to waive shipping costs. This source contends that the waivers were not accounted for in KVH's sales records, and that KVH internal reports indicate that actual shipping costs for the A5 in 2003 exceeded projected amounts by between $750,000 and $1 million.

KVH is also alleged to have granted one customer an unconditional right of return. According to the unnamed former KVH sales coordinator, in the fourth quarter of 2003, KVH allowed a customer to accept delivery of fifty A5s on the condition that the customer would be able to return any product that it could not sell. However, KVH did not disclose the terms of this sale in its financial reports.

Another act of channel stuffing identified by Plaintiffs is KVH's purported revocation of credit restrictions for certain customers. The unnamed former KVH shipping manager "explained [that] sales personnel would often override a 'credit-hold' on a customer account and authorize shipment using cash-on-delivery...credit terms." (Id. ¶ 48(c).) According to this source, an informal investigation conducted by KVH accounting personnel revealed that the majority of cash-on-delivery shipments were eventually returned, although KVH never adjusted its financial reports to account for these returns.

As a final example of KVH's channel stuffing activities, Plaintiffs broadly allege, without providing any specific factual assertions, that, "[a]s admitted by Defendants..., the Company's A5 sales and sales of other satellite communications products were subject to 'side agreements'

that granted price concessions to dealers on their current inventory of KVH products in order to provide incentives for additional purchases of the Company's products." (Id. ¶ 48(d).)

C. Shipment of Defective Products

Plaintiffs claim that in addition to the aforementioned alleged improper revenue recognition practices, KVH also shipped defective products, including defective A5 units, to customers. Two unnamed former KVH employees report that KVH shipped defective A5 units even after "shipping 'Hold' designations" had been assigned to them by the company's quality assurance department. (Id. ¶ 109.) These "Hold" designations indicate that certain components within a unit must be repaired before the unit can be shipped. It is alleged that many of these units ultimately were returned to KVH because they did not function properly.

Plaintiffs further allege that KVH shipped A5 units that would likely be damaged during the shipping process. The unnamed former KVH shipping clerk states that "hundreds" of A5 units, or almost ninety percent of the initial shipment of A5s, were returned during the initial sale period due to damage sustained during shipment. (Id. ¶ 57(f).) KVH continued to ship A5 units despite knowing about these difficulties.

Finally, Plaintiffs claim that KVH shipped refurbished A5 units in the place of new A5 units without informing customers that they were doing so. The unnamed former KVH sales coordinator reports that KVH recalled a number of A5 units that were unable to receive Direct TV satellite broadcast programming. KVH then "reconfigured" these malfunctioning units and sold them under the representation that they were new units. (Id.)

## II. STANDARD OF REVIEW

In reviewing a motion to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, this Court accepts the pleaded facts as true and draws all reasonable inferences from those allegations in favor of the plaintiff. Aldridge v. A.T. Cross. Corp., 284 F.3d 72, 78 (1st Cir. 2002) (applying standard to a private securities fraud action). Dismissal is appropriate only if it appears that the plaintiff cannot recover on any viable theory, based on the facts alleged. Rosenberg v. City of Everett, 328 F.3d 12, 15 (1st Cir. 2003).

## III. DISCUSSION

In their complaint, Plaintiffs assert claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, as well as Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l. Plaintiffs also bring claims under Section 20 of the Exchange Act, 15 U.S.C. § 78t, and Section 15 of the Securities Act, 15 U.S.C. § 77o, against the individual defendants, Kits van Heyningen and Spratt (the "Individual Defendants").

### A. Section 10(b) of the Exchange Act

#### 1. Elements and Pleading Requirements for Securities Fraud Actions

Section 10(b) of the Exchange Act prohibits the use or employment of any manipulative or deceptive device in connection with the purchase of any security and in contravention of Securities and Exchange Commission ("SEC") rules and regulations. 15 U.S.C. § 78j(b). One such rule, Rule 10b-5, prohibits the making of any untrue statement of material fact. 17 C.F.R. § 240.10b-5.

In order to state a claim under Rule 10b-5, a plaintiff must establish the following elements: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance, known as "transaction causation" in cases involving public securities markets; (5) economic loss; and (6) loss causation, or a causal connection between the misrepresentation and the loss. Dura Pharm., Inc. v. Broudo, --- U.S. ----, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005).

Securities fraud plaintiffs bringing claims under Rule 10b-5 additionally must meet the heightened pleading standards set forth under Rule 9 of the Federal Rules of Civil Procedure and under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4. Rule 9 requires plaintiffs to state the circumstances amounting to fraud "with particularity," Fed. R. Civ. P. 9(b), meaning that they must specify the allegedly fraudulent statements, the identity of the speaker, the time and place that the statements were made, and the reason why the statements are fraudulent. In re Allaire Corp. Sec. Litig., 224 F.Supp.2d 319, 325 (D. Mass. 2002). To satisfy the PSLRA, securities fraud plaintiffs must set forth "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

2. Defendants' Motion to Dismiss

In their motion to dismiss, Defendants contend that the complaint fails to state a cause of action under Section 10(b) and Rule 10b-5 for the following four reasons: (1) the complaint does not plead fraud with the requisite particularity; (2) the statements identified in the complaint as being actionable are not materially misleading; (3) the complaint does not create a strong

inference of scienter; and (4) the complaint does not make out a prima facie case of loss causation. The Court will address each argument in turn.

a. Particularity of the Pleadings of Fraud

Defendants argue that Plaintiffs have not set forth the alleged fraudulent acts with the degree of particularity required by the PSLRA for two principal reasons. First, Defendants insist that the confidential source material cited by Plaintiffs, on which the allegations of fraud are based, is not sufficiently reliable to survive the PSLRA particularity requirement. Second, Defendants claim that even if the allegations made by the confidential sources are deemed reliable, they nonetheless fail to satisfy the stringent particularity requirements.

(1) Use of Confidential Sources

Securities fraud plaintiffs may rely on confidential sources without specifically naming them "provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." In re Cabletron Sys., Inc., 311 F.3d 11, 29 (1st Cir. 2002) (quoting Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000)). Consequently, the Court must determine whether all of the facts alleged in the complaint "provide an adequate basis for believing that the defendants' statements were false." Id. "This involves an evaluation, inter alia, of the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." Id. at 29-30.

After applying this test to this complaint, the Court concludes that Plaintiffs' reliance on unnamed sources satisfies the PSLRA. The allegations in the complaint are not dependent on the

factual assertions of any one single confidential source, but rather the complaint contains the accounts of four separate former KVH employees. While the names of these sources are not provided, their specific job titles or positions are identified with some precision (i.e., a "shipping manager," an "order entry and logistics administrator"). These particular positions would likely make the former employees who held them familiar with the practices that they describe, creating an inference that these sources would have knowledge of the activities alleged in the complaint. For instance, the former shipping manager and the former shipping clerk would be expected to know whether, as they allege, undocumented orders were shipped to customers on a routine basis and whether these orders were eventually returned. Furthermore, the sources provide consistent accounts of particular fraudulent practices; as noted above, three of the four sources recount the shipment of two or three truckloads of unordered A5 units at the end of the fourth quarter of 2003 and two of them recall that KVH shipped defective A5 units. The consistency of these accounts reinforces the potential veracity of their allegations.

These alleged fraudulent practices are also described by the confidential sources with some degree of specificity. For example, the former shipping and receiving clerk explicitly names a KVH executive, Bruce Costa, who is alleged to have created orders for products remaining in inventory at the very end of each quarter. This clerk also names ABF Freight Systems as the particular freight carrier that would haul offsite the trailers containing this leftover inventory. The former shipping manager provides a relatively specific amount ($750,000-$1,000,000) by which KVH shipping costs exceeded budgeted amounts for 2004. Three sources recount one specific incident at the end of the fourth quarter of 2003 where two or three truckloads of A5 units were shipped without having been ordered. While the complaint is

inconsistent as to whether this particular customer was Featherlite, Inc. or Stag Parkway, the naming of these two customers offers some specificity and also narrows the universe of potential customers to whom these unordered units were shipped.

Defendants rightly note that the complaint does not state whether the confidential sources have personal knowledge of the facts that they allege. However, at oral argument, counsel for Plaintiffs represented to the Court that the allegations set forth by the confidential sources are indeed based on personal knowledge and at this stage of the proceedings, the Court may accept counsel's representation as true.

When looking at the totality of facts in the complaint attributed to the confidential sources and the allegations of fraud that they relate, the Court finds that the sources are described with sufficient particularity to support a presumption that persons in their respective positions would possess the information alleged. Accordingly, the complaint's reliance on the confidential sources satisfies the dictates of the PSLRA.

(2) Overall Degree of Particularity

Defendants also argue that the level of particularity in the complaint as a whole is insufficient under the PSLRA.

When determining whether a securities fraud plaintiff has satisfied the particularity requirements under the PSLRA, the First Circuit has adopted a fact-specific individual case analysis. Cabletron, 311 F.3d at 32. A securities fraud complaint will survive a motion to dismiss even "when some questions [remain] unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." Id.

The complaint here contains allegations of fraudulent acts committed by Defendants. It

includes consistent accounts by several former KVH employees of fictitious sales, channel stuffing, and the shipment of defective goods, all of which may be considered to be fraudulent practices. See, e.g., Cabletron, 311 F.3d at 25-26; Aldridge, 284 F.3d at 81; Greebel, 194 F.3d at 202. While these accounts do not contain exhaustive factual descriptions of the activities recounted, when considered together, they reinforce one another and provide sufficient particularity to satisfy the heightened pleading standards of Rule 9 and the PSLRA.

b. Materially False or Misleading Statements

The Court next turns to Defendants' argument that Plaintiffs have not adequately pled any materially false or misleading statements.

The PSLRA requires statements to be "misleading to a material degree" in order to be actionable in a private securities fraud action. Cabletron, 311 F.3d at 27. A fact is material when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1998) (internal quotation marks and citation omitted). The materiality of a particular statement is a question of fact that ordinarily is inappropriate for decision on a motion to dismiss and should instead be resolved by a jury. Cabletron, 311 F.3d at 34; Rosen v. Textron, Inc., 321 F.Supp.2d 308, 318 (D.R.I. 2004).

Plaintiffs allege that sixteen separate documents contain numerous materially misleading statements. (Compl. ¶¶ 49, 50, 51, 52, 53-54, 55, 56, 58, 60, 65-68, 70, 71-72, 73, 74, 75-76, 77.) These documents may be separated into the following three categories: (1) Defendants' filings with the SEC; (2) statements made by KVH officials, namely Kits van Heyningen and

Spratt, in company press releases and conference calls with market analysts; and (3) statements made by third party industry analysts that purportedly incorporate statements made by Defendants themselves.

(1) SEC Filings

In their complaint, Plaintiffs allege that a number of Defendants' filings with the SEC are materially misleading because they violate the Generally Accepted Accounting Principles ("GAAP") and therefore do not represent KVH's true financial picture. These filings include KVH's Form 10-Q Filings from November 14, 2003 (Id. ¶ 58) and from May 7, 2004 (Id. ¶ 77), its Form S-3 Registration Statement and Prospectus for the Secondary Offering (Id. ¶¶ 65-68), and its March 15, 2004 Form 10-K for the 2003 fiscal year (Id. ¶ 73).

GAAP "embody the prevailing principles, conventions, and procedures defined by the accounting industry from time to time." Young v. Lepone, 305 F.3d 1, 5 n.1 (1st Cir. 2002). Filings that contain violations of GAAP are presumed to be misleading. 17 C.F.R. § 210.4-01(a)(1); Baron, 380 F.3d at 55. However, "even when a company's disclosure is in violation of GAAP, 'some techniques...might prove to be entirely legitimate, depending on the specific facts.'" Baron, 380 F.3d at 55 (quoting Cabletron, 311 F.3d at 34) (alteration in original).

The First Circuit, in Cabletron, indicated that GAAP violations resulting from "systemic fraud...that extends to completely fictitious sales" are sufficient to establish liability under Section 10(b). Id., 311 F.3d at 35. Defendants' SEC filings are alleged to violate GAAP because of bookkeeping inaccuracies that result from systemic fraud, such as the purported fictitious sales and channel stuffing activities, including the undisclosed waiver of shipping costs, the granting of unconditional rights of return, and the lifting of credit restrictions. Plaintiffs maintain that

these irregularities inflated KVH's revenue by a significant degree; the fictitious sales at the end of the fourth quarter of 2003 alone would have constituted seventeen percent of A5 sales that quarter. (Compl. ¶ 42.) A reasonable investor would have deemed such a difference material, as "[a]ccurate earnings figures are vital aspects of the 'total mix of information' which investors would consult when evaluating [a corporation's] stock." Cabletron, 311 F.3d at 35. These filings therefore are actionable.

(2) Public Statements of KVH Executives

Plaintiffs also allege that KVH executives made numerous public statements that were materially misleading in light of the alleged ongoing fraudulent practices at KVH at the time the statements were issued. These statements may be attributed to KVH because direct statements of company executives to the press are imputed to the company itself. Cabletron, 311 F.3d at 35; Rosen, 321 F.Supp.2d at 319.

Defendants argue that the public statements are not actionable under Section 10(b) for a number of reasons. First, Defendants claim that the statements are not materially misleading. Second, Defendants insist that many of the identified statements are nothing more than "corporate puffery."[1] Finally, Defendants maintain that many of these statements qualify for the

---

[1]"Corporate puffery" has been described as "a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace–loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Orton v. Parametric Tech. Corp., 344 F.Supp.2d 290, 299-300 (D. Mass. 2004) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996)). In order to determine whether a particular statement is puffery, the statement should be considered in the context in which it was made. See Scritchfield v. Paolo, 274 F.Supp.2d 163, 174-175 (D.R.I. 2003). Examples of statements found by courts to be nonactionable puffery include an announcement that a company is "very confident" about "long term growth," Rosen, 321 F.Supp.2d at 321-22, language that a corporation "remains confident that [its] business is sound,"

PSLRA's exemption for forward-looking statements. Under the PSLRA, forward-looking statements are exempted from securities fraud liability if they are identified as forward-looking and are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement. 15 U.S.C. §§ 77z-2(c), 78u-5(c).

Plaintiffs, in their complaint, identify particular documents, such as press releases and conference call transcripts, quote lengthy and extensive passages from these documents, and then allege that the passages are misleading for various reasons. These passages are taken from KVH press releases issued on October 1, 2003 (Compl. ¶ 49), October 16, 2003 (Id. ¶ 52), November 4, 2003 (Id. ¶ 56), January 6, 2004 (Id. ¶ 60), February 19, 2004 (Id. ¶ 70), and April 22, 2004 (Id. ¶ 74), from a transcript of a February 19, 2004 conference call between Kits van Heyningen, Spratt, and market analysts (Id. ¶¶ 71-72), and from transcripts of two conference calls, one from October 16, 2003 (Id. ¶ 53-54) and one from April 22, 2004 (Id. ¶¶ 75-76), between Kits van Heyningen and market analysts. In their memorandum supporting their opposition to the motion to dismiss ("Plaintiffs' Memorandum"), Plaintiffs specify exactly which portions of these passages they deem to be misleading.

The majority of the allegedly misleading statements report the company's earnings, or the number of A5 units shipped, during a particular time span within the Class Period. The fictitious sales and channel stuffing activities purportedly committed by Defendants render both categories of statements materially misleading. If, as is described with some detail in the complaint,

---

Kafenbaum v. GTECH Holdings Corp., 217 F.Supp.2d 238, 250 (D.R.I. 2002), and a declaration that a product "exceeded [a company's] expectations." Allaire, 224 F.Supp.2d at 331.

Defendants shipped A5s to customers who had not ordered them and correspondingly reported such sales in KVH's financial statements, KVH's earnings and shipping figures for the particular periods in which these acts occurred would be falsely enlarged to a significant degree. Defendants' alleged shipments of damaged or reconfigured A5 units would further artificially inflate these figures. As these statements describe current or historical fact, they are neither mere puffery nor forward-looking. Therefore, they are actionable under Section 10(b).

The remaining statements identified by Plaintiffs may not be so easily categorized and must be analyzed individually.

<u>(A) October 1, 2003 Press Release</u>

In KVH's October 1, 2003 press release, Kits van Heyningen remarked that "[b]y the end of the [third quarter of 2003], we shipped approximately 150 [A5] units and anticipate shipping 2,000 to 3,000 units in the fourth quarter." (Compl. ¶ 49.) While the announcement of the number of A5 units shipped in the third quarter is a statement of historical fact that this Court has found to be actionable, the remainder of this statement, which forecasts the number of units to be shipped in the fourth quarter, is forward-looking. Because this press release is accompanied by an appropriate cautionary warning that "the statements regarding the company's financial and product development goals for 2003 are forward-looking statements" and the "actual results realized by the company could differ materially" (Defs.' Mem. Supp. Mot. to Dismiss at 28), Defendants' prediction is exempt from liability under the safe harbor offered by the PSLRA for forward-looking statements.

<u>(B) October 16, 2003 Press Release</u>

The complaint identifies the following statement made by Kits van Heyningen in KVH's

October 16, 2003 press release:

> KVH is the first company in the world to develop, produce, and ship a low-profile in-motion phased array antenna that brings live satellite TV to consumers in SUVs and mini-vans nationwide. As the first to market, we have an excellent opportunity to secure a strong and lasting competitive position in the automotive multimedia market.

(Compl. ¶ 52.) Plaintiffs do not dispute Defendants' claim that KVH was the first company to sell a product like the A5, but argue that this statement, when read in context, is misleading because Defendants failed to disclose the difficulties they experienced with shipping and selling the A5 at the time this press release was issued. However, Defendants' remark that KVH has an "excellent opportunity" for future growth is nothing more than a "rosy affirmation" about the company's outlook and would not be deemed material by a reasonable investor. Kafenbaum, 217 F.Supp.2d at 250 (statements that a company was "on course to restore growth in the business" and "remains confident that [its] business is sound" are corporate puffery and not actionable).

(C) October 16, 2003 Conference Call

Plaintiffs allege that a number of statements made by Kits van Heyningen in a October 16, 2003 conference call with market analysts are misleading because they misrepresented KVH's capabilities at that time.

The first challenged statement notes that KVH "succeeded and began shipping our [A5] in Q3 to our dealers throughout the country." (Compl. ¶ 53 (alteration in original).) This statement cannot be misleading because it is true; KVH did indeed begin shipping the A5 in the third quarter of 2003 and Plaintiffs do not claim otherwise.

The second challenged statement from this conference call reads as follows: "The initial response from dealers to consumer [sic] has also been extremely positive. We now have

approximately 740 retail outlets and expect to have between eight and 900 dealers [sic] by the end of the year." (Id. ¶ 53.) The first part of this statement, which concerns the "extremely positive" response to the A5, is so "loosely optimistic" that a reasonable investor would be unlikely to consider it important. See Orton, 344 F.Supp.2d at 300 (quoting Shaw, 82 F.3d at 1217). Furthermore, Plaintiffs have not alleged that the initial response to the A5 from customers or retailers was anything other than positive. Plaintiffs claim that much of the original shipment of A5 units was returned due to damage sustained during the shipping process, but nowhere do they assert that these returns caused either dealers or consumers to be displeased with the product or its performance. The second part of this statement, which pertains to the amount of retailers offering the A5 for sale, is not contested. Plaintiffs do not allege that Kits van Heyningen misstated the actual or projected number of A5 dealers. The entire statement therefore is not actionable.

In the third challenged statement, Kits van Heyningen made the following representation: "As of today, we can build [A5s] at a rate of about 250 per week. The production level that we're at now enables us to produce and ship our fourth quarter target of 2,000 to 3,000 [A5] systems. So we don't have any production constraints." (Compl. ¶ 53.) This statement of KVH's production capabilities as of October 2003 is allegedly misleading because KVH initially shipped and then recalled a number of A5s that could not properly receive Direct TV satellite signals and also shipped defective A5s that needed repairs. Consequently, Plaintiffs adequately assert a securities fraud claim as to this statement.

The fourth statement challenged by Plaintiffs is the following comment: "So looking ahead to Q4, I believe that we'll see strong year-over-year revenue growth in the range of 30-

50% driven largely by sales with [A5] and our other satellite products." (Compl. ¶ 53 (alteration in original).) As this statement predicts KVH's revenue for the fourth quarter of 2003, it is forward-looking and exempt from liability under the PSLRA because the conference call was preceded by proper cautionary language alerting the listener or future reader that the company's results might differ from the projections stated therein.

The final challenged statement submits that KVH has "had some returns for shipping damage, which was less than ten units, and [has] addressed that through better packaging and that's a non-issue now." (Compl. ¶ 54.) Plaintiffs contend that this statement is misleading because it fails to disclose the accurate amount of A5 returns in the third quarter of 2003. When compared against the allegation of the unnamed former KVH shipping clerk that "hundreds" of A5s, including an estimated ninety percent of the initial shipment, were returned, Kits van Heyningen's representation that only ten A5 units were returned as of October 2003 could be deemed materially misleading.

<u>(D) November 4, 2003 Press Release</u>

Plaintiffs contest the entirety of the November 4, 2003 KVH press release, entitled "Retailers & Customers Praise New KVH TracVision A5 Satellite TV for Automobiles," which declares that the A5 was well received upon its introduction to the market. According to the complaint, the document states as follows:

> Retailers and customers alike are offering rave reviews of the [A5]'s performance, design, and the unmatched variety of entertainment and news now available in cars via satellite.
>
> ....
>
> Customers are also thrilled with the [A5] and receiving live satellite TV on the move. Speaking from his office in Adelanto, CA, Tony Giagnocavo, owner of Western Conveyor, commented on how the [A5] now installed aboard his

> Cadillac Escalade is getting the attention of people around him. "It seems to catch a lot of people's eyes. I'm sure it will catch the eyes of families with kids in the back."
>
> ....
>
> When asked about his customers' interest in the [A5], Mr. Hill at Signature Audio said, "I'm a single store and had no problem ordering 10 [A5] systems right off the bat when I learned about it. My first 10 are already spoken for!" ...In addition to national retailers like Tweeter, retailer/expediters like Freeman's Car Stereo, and 12-volt specialty retailers like Signature Audio, the [A5] is sold through a nationwide network of more than 740 authorized retailers.

(Compl. ¶ 56 (alterations in original).) This press release simply announces that retailers and customers have offered "rave reviews" of the A5. This is classic corporate puffery that is "so vague, so general, [and] so loosely optimistic" that no reasonable investor would rely on it when deciding whether to purchase KVH stock. Scritchfield, 274 F.Supp.2d at 174 (quoting In re Number Nine Visual Tech. Corp. Sec. Litig., 51 F.Supp.2d 1, 20 (D. Mass. 1999)). Moreover, Plaintiffs have not alleged that customers or retailers were unhappy with the A5. Consequently, any claim predicated on this statement must be dismissed as a matter of law.

(3) Statements Made by Third Parties

The complaint also includes reports about KVH published by market analysts. These reports are an October 2, 2003 Needham Report on KVH, which "find[s] the company's 2,000-3,000 A5 unit estimate for the A5 encouraging in that it demonstrates solid initial demand for the A5 and some confidence on the company's part in its ability to meet this demand" (Compl. ¶ 51); an October 2, 2003 report from WR Hambrecht & Co. noting that "[fourth quarter of 2004] top-line guidance is very positive, as the company expects 2,000-3,000 A5 unit shipments" and that "we expect margins to improve as volumes ramp...[and] maintain our buy rating as we continue to believe the A5 has the potential to double KVH's revenue over the next 2-3 years" (Id. ¶ 50);

and an October 17, 2003 Needham Report on KVH stating that "[m]anagement reaffirmed its expectations of 2,000-3,000 A5 units in the [fourth quarter of 2003] and suggested it was not currently production limited with a 250/week production rate" (Id. ¶ 55). Defendants allegedly are responsible for these reports because they are based on statements made by Defendants themselves.

A company may be held liable for statements made by third parties if those statements satisfy the "entanglement test." Cabletron, 311 F.3d at 37. Under the entanglement test:

> [L]iability may attach to an analyst's statements where the defendants have expressly or impliedly adopted the statements, placed their imprimatur on the statements, or have otherwise entangled themselves with the analysts to a significant degree.... [T]he court will determine whether the complaint contains allegations which, favorably construed and viewed in the context of the entire pleading, could establish a significant and specific, not merely a casual or speculative, entanglement between the defendants and the analysts with respect to the statements at issue.

Id. at 37-38 (quoting Schaffer v. Timberland Co., 924 F.Supp. 1298, 1310 (D.N.H. 1996)). Consequently, a company need not exercise any control over the third party statements in order to be held liable for their content. However, "an entanglement claim will be rejected if it merely assumes that company insiders provided the information on which analysts or other outsiders based their reports." Id. at 38.

In Cabletron, the First Circuit found that an analyst report satisfied the entanglement test when it stated, on the basis of information provided by company executives, that a certain product would ship on a certain date. Id. Accordingly, to the extent that the analyst reports mentioned in the complaint expressly incorporate specific A5 shipping estimates and accounts of current production capabilities given by Kits van Heyningen or Spratt in company press releases

and conference calls, they fulfill the entanglement test. By quoting shipping and production figures that are allegedly misleading due to KVH's fictitious orders and its shipment of defective and reconfigured products, these portions of the reports are "situations where company officials 'intentionally foster a mistaken belief concerning a material fact.'" Id. at 38 (quoting Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163-64 (2d Cir. 1980)). They thereby exhibit sufficient entanglement to establish a basis for liability on the part of Defendants.

To the extent that the analyst reports offer opinions or analysis of their own regarding the shipping and production figures, they fail to properly allege entanglement. While it is evident that these reports explicitly integrate shipping and production figures offered by Defendants, it is similarly evident that the interpretation of those figures contained in the reports is the work of the analysts themselves. The complaint lacks any allegations as to how Defendants entangled themselves with these opinions. As it appears that Defendants provided information on which the analysts then independently relied, Defendants cannot be held liable for these opinions.

In order to create liability under Rule 10b-5, the shipping and production figures quoted in the analyst reports need not only satisfy the entanglement test, but must also be materially misleading. The October 17, 2003 Needham Report's specification of the A5 production rate at that date allegedly is misleading due to KVH's initial production and shipment of defective and reconfigured A5 units. Being a statement of present fact, it is actionable. However, the shipping estimates in all of the analyst reports are mere forward-looking statements that do not purport to be anything more than accounts of future expectations. Statements such as these, which are "naked prediction[s] unsupported by any facts," would not be considered to be material by a reasonable investor and are not actionable. Scritchfield, 274 F.Supp.2d at 182, 187 (finding that

a forecast of a company's earnings and total customers for a particular time period to be not actionable). Consequently, the only actionable statement in any of the analyst reports is the October 17, 2003 Needham Report's statement that "[m]anagement...suggested that it was not currently production limited with a 250/week production rate."

c. Scienter

In order to withstand Defendants' motion to dismiss, Plaintiffs must also adequately plead scienter. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Under the PSLRA, a securities fraud plaintiff must state with particularity facts that create a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). "Accordingly, while a district court ruling on a motion to dismiss must continue to make all inferences in a plaintiff's favor, the inferences relating to scienter must be strong ones." Rosen, 321 F.Supp.2d at 317.

To determine whether a plaintiff has pled a strong inference of scienter, the First Circuit instructs courts to engage in a fact-specific approach on a case-by-case basis. Cabletron, 311 F.3d at 38; Greebel, 194 F.3d at 196. A plaintiff may not simply allege that a defendant made a particular false or misleading statement. Geffon v. Micrion Corp., 249 F.3d 29, 35 (1st Cir. 2001). Instead, "the plaintiff must show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness." Aldridge, 284 F.3d at 82.

The First Circuit has "specifically rejected the contention that 'facts showing motive and opportunity can never be enough to permit the drawing of a strong inference of scienter.'" Cabletron, 311 F.3d at 39 (quoting Greebel, 194 F.3d at 197). Instead, it has held that a "plaintiff may combine various facts and circumstances indicating fraudulent intent–including those

demonstrating motive and opportunity–to satisfy the scienter requirement." Id. at 39 (quoting Aldridge, 284 F.3d at 82). "However, 'catch-all allegations' which merely assert motive and opportunity, without something more, fail to satisfy the PSLRA." Id. at 39 (internal citation omitted). That "something more" may consist of instances of conscious wrongdoing, such as significant GAAP violations and "accounting shenanigans." Id. at 39; see also Geffon, 249 F.3d at 36; Rosen, 321 F.Supp.2d at 323.

The bulk of Plaintiffs' scienter allegations are found in the following two paragraphs:

> Defendants acted with scienter in that [they] knew that [their public statements] were materially false or misleading; knew that such statements...would be issued...to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements...as primary violations of the federal securities laws. [D]efendants, by virtue of their receipt of information reflecting the true facts regarding KVH, their control over, and/or receipt and/or modification of KVH's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning KVH, participated in the fraudulent scheme alleged herein.
>
> Further evidencing Defendants' scienter..., Defendants successfully completed the [Secondary Offering], issuing more than 2.7 million shares to the unsuspecting public at artificially inflated prices, thereby generating proceeds of more than $51.5 million. Had the truth been known, KVH would not have been able to sell its common stock at the price it did.

(Compl. ¶¶ 163-164.) These statements are not the strongest allegations of scienter conceivable, but for the purposes of satisfying the PSLRA on a motion to dismiss, this Court finds that, when read along with the rest of the complaint, they pass muster.

In Cabletron, the First Circuit suggested that, at this stage of the proceedings, allegations pointing to both motive and large-scale fraudulent practices may be sufficient to create a strong inference of scienter. Id., 311 F.3d at 39. As in Cabletron, Plaintiffs here have made "adequate

particularized allegations of large-scale fraudulent practices over time[,]" making it "difficult to escape a strong inference of the type of recklessness concerning wrongdoing that amounts to scienter." Id. According to the complaint, Defendants allegedly shipped A5 units to customers who had not ordered them, parked goods in trailers that sat in the KVH yard, waived shipping costs without accounting for such waivers in KVH's records and accounting statements, granted unconditional rights of return in violation of KVH's stated return policy, lifted credit restrictions on customers in order to authorize delivery of A5 units, and provided customers with A5 units that had been assigned "Hold" designations by the quality assurance department. These acts, taken together, certainly suggest large-scale fraud. The complaint's allegation that a KVH executive, Bruce Costa, instigated fictitious sales on a regular basis suggests that the company's fraudulent practices were not limited to its low-level employees but rather reached the very top of its corporate hierarchy. The complaint also alleges that KVH's reliance on the success of the A5 served as a strong motive for the purported fraud. Cf. id. (indicating that the concealment of a company's deteriorating financial health supports a motive for scienter); Aldridge, 284 F.3d at 83 ("When financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter."). KVH invested $19.5 million in the research initiatives that created the A5, and one can infer that it sought to recoup its significant investment in this new technology. Add to this the fact that the Secondary Offering, from which Defendants raised $51.5 million, was timed to occur contemporaneously with the rollout of the A5, and an inference of motive to issue the misleading statements becomes not only plausible but likely. See Crowell v. Ionics, Inc., 343 F.Supp.2d 1, 19 (D. Mass. 2004) ("Deliberate overstatement of revenues to consummate a major

sale or acquisition of stock or assets is sufficient to support a strong inference of scienter."). Accordingly, when considered in the light most favorable to Plaintiffs, the complaint, with its allegations of motive and large-scale fraudulent practices, creates a strong inference of scienter.

d. Loss Causation

Finally, Defendants claim that Plaintiffs have not adequately pled loss causation under the standard recently announced by the Supreme Court in Dura Pharmaceuticals, Inc. v. Broudo.

Loss causation describes the existence of a causal connection between the misrepresentation made by the defendant and the loss suffered by the plaintiff. Dura, 125 S.Ct. at 1631. To survive a motion to dismiss, a securities fraud plaintiff must allege that the value of the security declined as a result of the misrepresentation; an inflated purchase price does not, by itself, constitute loss causation. Id. at 1633. However, "it should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Id. at 1634.

Plaintiffs' allegations regarding loss causation center on a July 6, 2004 KVH press release entitled "KVH Provides Second Quarter Update; Revenue to Be Approximately $14.2 Million to $14.5 Million." In this press release, KVH reported between $14.2 million and $14.5 million in revenue for the second quarter of 2004, an amount falling "well below" the company's expectations for the quarter and representing a nineteen percent decline from the previous quarter. (Compl. ¶ 79.) Spratt attributed this decline to "lower than expected sales for [KVH's] military navigation products and land mobile satellite systems," while Kits van Heyningen ascribed it to "an unusual timing of reorders from [KVH's] major RV customers, potential key military programs where purchasing decisions have been delayed, and booked fiber optic product

orders that were rescheduled for the third quarter rather than in the second." (App. to Defs.' Mem. Supp. Mot. to Dismiss at 359.) It was also announced that the suggested retail price of the A5 would drop from $3,495 to $2,295 per unit. (Compl. ¶ 79.) Plaintiffs claim that "KVH's problems became known to the public" in this press release. (Id.) The price of KVH common stock dropped nearly 24% on the day the press release was issued, falling from $12.50 per share to $9.51 per share. (Id. ¶ 80.)

Defendants argue that the press release and the resulting drop in the price of KVH common stock fails to establish loss causation because the press release does not attribute the declining revenue to the sales of the A5. While Spratt assigned a portion of the blame for the drop in revenue to the lower than expected sales of land mobile satellite systems, Defendants claim that Kits van Heyningen limited the scope of those lower sales to KVH's "major RV customers" further on in the press release. The A5 is a land mobile satellite system, but Defendants note it was designed for use in automobiles, not RVs. Under Defendants' proposed interpretation, the press release could not have revealed any misrepresentations regarding the A5 because it did not attribute the decreased revenue to A5 sales.

However, Defendants fail to recognize the allegation in the complaint that KVH began marketing the A5 in the RV market during the second quarter of 2004. (Id. ¶ 76.) In a conference call on April 22, 2004, Kits van Heyningen stated that "Stag Parkway, the country's leading after-market distributor of RV accessories[,] is now offering the A5 through its national network of retailers. While we [at KVH] remain solidly focused on the automotive market for the TracVision A5, we do expect to see incremental A5 sales through the RV channel going forward." (Id.) Even assuming that the July 6, 2004 press release does indeed attribute the lower

than expected sales of land mobile satellite systems to KVH's RV customers, as Defendants maintain, those sales might well have included the sale of A5 units. Consequently, the press release, taken in the light most favorable to Plaintiffs, can be plausibly understood to announce that disappointing A5 sales figures caused a decline in both KVH's satellite product revenue and its overall revenue.

Plaintiffs, at this stage of the proceedings, need only express "a short and plain statement of the claim showing that [they are] entitled to relief." Dura, 125 S.Ct. at 1634 (quoting Fed. R. Civ. P. 8(a)(2)). As they have alleged that the price of KVH stock dropped after the truth regarding Defendants' misrepresentations became known, this Court finds that they have met their burden of pleading loss causation.

B. Section 20 of the Exchange Act

Section 20(a) of the Exchange Act imposes liability on persons who control other persons who violate the Act. "To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company." Aldridge, 284 F.3d at 85. Control is a question of fact that typically is improper for resolution on a motion to dismiss. Cabletron, 311 F.3d at 41.

Plaintiffs allege that Kits van Heyningen and Spratt exercised control over KVH due to their positions as President, Chief Executive Officer, and Director, and Chief Financial Officer respectively. Plaintiffs also claim that these individuals made public statements and signed SEC filings that contained allegedly materially misleading statements. Given both these facts and this Court's rulings with respect to the Section 10(b) claims, the Court finds that Plaintiffs have met their burden with respect to Section 20(a).

C. Sections 11, 12(a)(2), and 15 of the Securities Act

Plaintiffs allege that Defendants are liable under Sections 11 and 12(a)(2) of the Securities Act and that the Individual Defendants also are liable under Section 15 of the Securities Act. When ruling on the Section 10(b) claims, this Court found the complaint to have been pled with the requisite particularity to satisfy Rule 9(b). Consequently, this Court also finds that the complaint contains sufficient factual allegations to survive a motion to dismiss on the Section 11, 12(a)(2), and 15 claims.

## IV. CONCLUSION

For the reasons set forth above, this Court finds that some of Plaintiffs' allegations adequately set forth violations of federal securities laws. Accordingly, Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint is granted only with respect to those statements identified in section III.A.2.b. *supra* that appear in paragraphs 49, 50, 51, 52, 53, 55, and 56 of the complaint. The motion is denied as to all of Defendants' other claims.

SO ORDERED.

Mary M. Lisi
Mary M. Lisi
United States District Judge
August 11, 2005