UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SEKUK GLOBAL ENTERPRISES, On Behalf of Itself And All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>KVH INDUSTRIES, INC., MARTIN A. KITS VAN HEYNINGEN, and PATRICK J. SPRATT,<br><br>Defendants. | Civil Action No. CA-04-306L<br>**(Consolidated Action)**<br><br>CLASS ACTION<br><br>MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION |

TABLE OF CONTENTS

Page

I. Preliminary Statement ....... 1

II. Argument ....... 3

A. General Standards ....... 3

B. The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Proposed Class ....... 4

1. TAPP is Sufficiently Familiar With The Fats of This Case To Serve As Class Representative ....... 5

2. Irving S. Braun Is Adequate And Typical To Serve As Class Representative ....... 10

a. Mr. Braun Demonstrated A Detailed Understanding Of The Case And His Role And Responsibilities ....... 10

b. Mr. Braun's Claims Are Typical of the Claims of the Proposed Class ....... 12

3. TAPP And Mr. Braun Have Fully Participated in Class Certification Discovery ....... 14

C. It is Premature To Exclude So-Called "In-And-Out Traders" From the Proposed Class ....... 15

III. Conclusion ....... 17

## TABLE OF AUTHORITIES

### CASES

*Adair v. Sorenson*,
134 F.R.D. 13 (D. Mass. 1991) .......... 3

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 4

*Andrews v. Bechtel Power Corp.*,
780 F.2d 124 (1st Cir. 1985) .......... 5

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
185 F.R.D. 172 (S.D.N.Y. 1999) .......... 10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) .......... 3

*Beck v. Status Game Corp.*,
No. 89 Civ. 2923 (D.N.E.), 1995 U.S. Dist. LEXIS 9978
(S.D.N.Y. July 14, 1995) .......... 10

*Cameron v. E.M. Adams & Co.*,
547 F.2d 473 (9th Cir. 1976) .......... 12

*Cheney v. CyberGuard Corp.*,
213 F.R.D. 484 (S.D. Fla. 2003) .......... 10

*County of Suffolk v. Long Island Lighting Co.*,
710 F. Supp. 1407 (E.D.N.Y. 1989) .......... 7, 8

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .......... 2, 15, 16

*Esplin v. Hirschi*,
402 F.2d 94 (10th Cir. 1968) .......... 4

*Fulco v. Continental Cablevision, Inc.*,
No. 89-1342-S, 1990 U.S. Dist. LEXIS 11393
(D. Mass. June 19, 1990) .......... 8, 11

*Grace v. Perception Technology Corp.*,
128 F.R.D. 165 (D. Mass. 1989) .......... 3

*Griffin v. GK Intelligent Sys.*,
196 F.R.D. 298 (S.D. Tex. 2000) .......... 10, 11

*Guckenberger v. Boston Univ.*,
957 F. Supp. 306 (D. Mass. 1997) ........ 12

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ........ 14

*Hoxworth v. Blinder, Robinson & Co.*,
980 F.2d 912 (3d Cir. 1992) ........ 12, 13

*In re CornerStone Propane Ptnrs*, No. C 03-2522 MHP, 2006 U.S. Dist. LEXIS 25819
(N.D. Cal. May 3, 2006) ........ 17

*In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.*,
206 F.R.D. 514 (M.D. Fla. 2002) ........ 7, 9

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
MDL Docket No. 02-1335-B, 2006 U.S. Dist. LEXIS 38901
(D.N.H. June 12, 2006) ........ 2, 15, 17

*In re Vicuron Pharms. Inc. Sec. Litig.*,
233 F.R.D. 421 (E. D. Pa. 2006) ........ 3

*In re Visa Check/Mastermoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) ........ 13

*J. H. Cohn & Co. v. American Appraisal Associates, Inc.*,
628 F.2d 994 (7th Cir. 1980) ........ 14

*Kahan v. Rosenstiel*,
424 F.2d 161 (3d Cir. 1970) ........ 4

*Kelley v. Mid-America Racing Stables, Inc.*,
139 F.R.D. 405 (W.D. Okla. 1990) ........ 10, 11

*Kinney v. Metro Global Media, Inc.*,
C.A. No. 99-579 (ML), 2002 U.S. Dist. LEXIS 18628
(D.R.I. Aug. 22, 2002) ........ *passim*

*Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283 (3rd Cir. 1998) ........ 13

*Priest v. Zayre Corp.*,
118 F.R.D. 552 (D. Mass. 1988) ........ 5

*Rolex Employees Retirement Trust v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) ........ 10

*Rosen v. Textron, Inc.*,
369 F. Supp. 2d 204 (D.R.I. 2005) .......... 8, 11

*Smilow v. Southwestern Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003) .......... 4, 12

*Swack v. Credit Suisse First Boston*,
230 F.R.D. 250 (D. Mass. 2005) .......... 12

*Warren v. Reserve Fund, Inc.*,
728 F.2d 741 (5th Cir. 1984) .......... 14

*Wortley v. Camplin*,
333 F.3d 284 (1st Cir. 2003) .......... 15

## STATUTES, RULES and REGULATIONS

Fed. R. Civ. P. 9(b) .......... 16

Fed. R. Civ. P. 23 .......... *passim*

Lead Plaintiff Teamsters Affiliate Pension Plan ("TAPP") and Plaintiffs Irving S. and Judith Braun (collectively with TAPP, the "Plaintiffs") respectfully submit this reply memorandum of law in further support of their motion to certify this action as a class action and certifying TAPP and Irving S. Braun ("Mr. Braun") as Class Representatives.[1]

## I. PRELIMINARY STATEMENT

In their opening motion, Plaintiffs argued that this action met all of the requirements of a class action as provided for in Rule 23 and that it should be certified as a class action, they should be certified as Class Representatives and their counsel should be certified as Class Counsel. In opposition, Defendants effectively concede that this action is perfectly suited for class action status (although they improperly attempt to redefine and restrict the Class) and focus their arguments on the adequacy and typicality of TAPP and Mr. Braun. In other words, Defendants do not have an issue with this case being a class action only with the Plaintiffs that are presently seeking to lead it.

The thrust of Defendants' adequacy and typicality argument is that TAPP and Mr. Braun do not have sufficient knowledge of this case and, as a result, are not in control of their lawyers. Def. Mem. at 7, 11.[2] A review of the record, however, easily refutes this contention. As detailed herein, since the inception of this litigation in 2004, TAPP and Mr. Braun have vigorously pursued this litigation in an effort to achieve the best results for the Class. Plaintiffs overcame the significant pleading hurdles embodied in the Private Securities Litigation Reform Act (the "PSLRA") by defeating Defendants' motion to dismiss and have provided extensive class certification discovery

---

[1] Plaintiffs respectfully withdraw Judith Braun from this action and are no longer seeking to have her serve as a Class Representative. Mrs. Braun's only involvement in this action was to have been listed as a joint account holder on the securities account through which her husband, Mr. Braun, bought and sold KVH stock. Defendants, who were advised of the aforementioned facts, have previously indicated that they do not oppose Mrs. Braun's withdrawal.

[2] "Def. Mem." refers to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification filed with the Court on May 15, 2006 (Docket No. 66.)

producing thousands of pages of documents and sitting for depositions. At the same time, Plaintiffs have been aggressively pursuing merits discovery and have conducted extensive third party discovery in addition to propounding document requests on Defendants. Both TAPP and Mr. Braun have overseen the prosecution of this litigation and maintained appropriate control over their counsel. The foregoing sufficiently establishes Plaintiffs' adequacy and typicality as it is respectfully submitted that TAPP and Mr. Braun are no different from the Plaintiffs certified as Class Representatives by this Court in *Kinney v. Metro Global Media, Inc.*, C.A. No. 99-579 (ML), 2002 U.S. Dist. LEXIS 18628 (D.R.I. Aug. 22, 2002).

Aside from their adequacy and typicality arguments, Defendants improperly attempt to limit the definition of the Class to exclude so called in-and-out traders citing the United States Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005)("*Dura*"). In this regard, Defendants contend that any class member that sold prior to the end of the Class Period cannot establish loss causation under *Dura* and should be excluded from the Class. Defendants' argument is based on the fact that the Complaint, which was filed well before the decision in *Dura*, only pleads a single corrective disclosure. As detailed herein, however, Plaintiffs will establish through discovery that there were multiple corrective disclosures that caused investors to suffer damages and, therefore, it is premature to limit the Class as Defendants suggest. *See In re Tyco Int'l, Ltd. Multidistrict Litig.*, MDL Docket No. 02-1335-B, 2006 U.S. Dist. LEXIS 38901 at *22-*23 (D.N.H. June 12, 2006) (holding that issue of corrective disclosures was premature at class certification stage). Defendants can seek to address the issue of damages at summary judgment.

For the foregoing reasons, as well as those set forth herein, it is respectfully submitted that the Class should be certified.[3]

## II. ARGUMENT

### A. General Standards

The important role of Rule 23 in federal securities actions is well established. *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Courts within the First Circuit consistently have held that class actions are a particularly appropriate means by which shareholders may obtain recovery caused by defective registration statements and fraudulent misrepresentations. In light of the importance of the class action device in securities litigation, the courts in this circuit apply Rule 23 according to a liberal standard. "It is well established 'that suits on behalf of shareholders alleging violations of federal securities laws are prime candidates for class action treatment and that Rule 23 of the Federal Rules of Civil Procedure has been liberally construed to effectuate that end.'" *Kinney*, 2002 U.S. Dist. LEXIS 18628, at *7 (quoting *Grace v. Perception Technology Corp.*, 128 F.R.D. 165, 167 (D. Mass. 1989); *Adair v. Sorenson*, 134 F.R.D. 13, 16-17 (D. Mass. 1991) (suits on behalf of shareholders alleging violations of federal securities laws are prime candidates for class action treatment).

---

[3] Defendants also improperly attempt to restrict Mr. Braun's prospective role as a Class Representative by suggesting that he has solely moved to represent purchasers in KVH's secondary offering of stock. Def. Mem. at 1-2. Plaintiffs' class certification motion contains no such distinction. Indeed, Mr. Braun can properly serve as a Class Representative for all claims in this case as his purchases in the secondary offering give rise to claims under both the Securities Act and the Exchange Act. Similarly, TAPP may properly represent all claims even though it did not buy directly in the secondary offering. *See In re Vicuron Pharms. Inc. Sec. Litig.*, 233 F.R.D. 421, 425 (E. D. Pa. 2006) (citations omitted) (certifying class representative for Exchange Act and Securities Act claims despite fact that proposed Class Representative arguably did not have standing to pursue Securities Act claims and holding that issue of standing was merits-based and not appropriate on class certification motion).

By providing a single forum in which to litigate the same or similar claims, a class action also affords an indispensable mechanism for the conservation of judicial resources. *Kahan v. Rosenstiel*, 424 F.2d 161, 169 (3d Cir. 1970) ("the effectiveness of the securities laws may depend in large measure on the application of the class action device.") "[T]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." *Esplin v. Hirschi*, 402 F.2d 94, 101 (10th Cir. 1968).

The proposed Class must meet the four prerequisites of Fed. R. Civ. P. 23(a) as well as certain requirements of Fed. R. Civ. P. 23(b). *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). Fed. R. Civ. P. 23 provides that an action may be maintained as a class action if each of the four prerequisites of Rule 23(a) are met and, in addition, the action qualifies under on of the subdivisions of Rule 23(b).

As set forth in Plaintiffs' opening brief, the proposed Class meets each of the procedural requirements for class certification set forth in Rule 23. Defendants' sole opposition is to challenge TAPP's and Mr. Braun's adequacy under 23(a)(4) and Mr. Braun's typicality under 23(a)(3). It is these arguments that we turn to now.

### B. The Proposed Class Representatives Will Fairly and Adequately Protect the Interests of the Proposed Class

Fed. R. Civ. P. 23(a) provides, in part, that one or more members of a class may sue or be sued as representative parties on behalf of all only if (4) the representative parties will fairly and **adequately** protect the interests of the class.

In order to satisfy the adequacy prong, Plaintiffs must make a two-part showing. Plaintiffs must show "'that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation.'" *Kinney*, 2002 U.S. Dist.

LEXIS 18628, at *15 (quoting *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). As detailed herein, Plaintiffs have satisfied both prongs of Fed. R. Civ. P. 23(a)(4).

Plaintiffs do not have any interests that conflict with those of the Class and, moreover, Defendants have not identified any conflicts in their opposition brief. Indeed, Plaintiffs' claims are identical to those of the proposed Class. Plaintiffs, like the absent Class members, were damaged when they purchased shares of KVH stock at artificially inflated prices and the truth about KVH was disclosed causing a decline in the price of KVH stock. *See* e.g., *Priest v. Zayre Corp.*, 118 F.R.D. 552, 555 (D. Mass. 1988). Thus, as Plaintiffs offer evidence to prove their own claims against the Defendants, this effort will simultaneously advance the interests of the Class. Plaintiffs have also retained counsel that has extensive experience and well qualified to prosecute this action. *See* Affidavit of Barry J. Kusinitz, Exhibit D, Resumes of Lerach Coughlin and Barry J. Kusinitz (Docket # 11). Defendants have not raised any challenges to the competency of Plaintiffs' counsel to litigate this action.

Defendants' adequacy argument is that TAPP and Mr. Braun will not adequately and fairly protect the interests of the Class because, in Defendants' view, they do not know enough about this litigation. Def. Mem. at 3, 10. As set forth below, a fair review of the record demonstrates that Defendants are wrong.

### 1. TAPP is Sufficiently Familiar With The Facts of This Case To Serve As Class Representative

TAPP has demonstrated a sufficient knowledge of this case and its ability to direct Class counsel thereby establishing its adequacy to serve as Class Representative. On April 20, 2006, Dale C. Harrison ("Harrison"), the Assistant Director of TAPP's Investment and Pension Administration, was deposed by Defendants in connection with class certification discovery. During the deposition, Mr. Harrison detailed the circumstances surrounding TAPP's purchase of KVH stock, its role as Lead Plaintiff and its prosecution of this case.

As an initial matter, Mr. Harrison explained that he and Mr. Thomas C. Metzinger, the Director of TAPP's Investment and Administration, oversee administrative duties for the International Brotherhood of Teamster's ("IBT") pension and benefit plans with assets having a market value of approximately $800 million. TAPP, as the primary investment fund for the IBT's member pension plan, manages assets with a market value of approximately $500 million to $620 million. *See* Deposition Transcript of Dale Harrison, April 20, 2006 ("Harrison Depo.") at 19:10-20:17; 32:14-22; 135:18-137:19. (Excerpts from Mr. Harrison's deposition are attached hereto as Exhibit A.) Mr. Harrison further explained that early in the litigation TAPP came forward to serve as a Lead Plaintiff in the action based on the decision of TAPP's board of trustees, and submitted a certification, signed by C. Thomas Keegel, a member of TAPP's Board of Trustees. Harrison Depo. at 77:2-78:1.[4]

Mr. Harrison explained that TAPP incurred more than $730,000 in estimated losses based on its purchase of more than 65,000 shares of KVH common stock during the Class Period. *See* Harrison Depo. at 81:21-24; 82:1-3. Further, he noted that TAPP's participation in the lawsuit was premised on TAPP's "fiduciary responsibility to try to recoup any losses if the Plan lost $730,000 for our members that's our obligation to get that back." *See* Harrison Depo. at 81:3-6. In other words, TAPP has strong incentives to pursue this litigation. Mr. Harrison also demonstrated knowledge of the allegations of the Complaint. In this regard, he testified that this case primarily concerned Defendants' "hyped up" representations concerning KVH's satellite TV systems which

---

[4] Mr. Harrison also testified that TAPP was notified of this action through a portfolio monitoring agreement between TAPP and Lerach. Under the agreement Lerach periodically reviews TAPP's investment portfolio and notifies TAPP of pending or existing litigation where the fund has suffered a loss in the subject securities. Mr. Harrison testified that upon receipt of such notice, the final decision to participate in any action rests with TAPP's Board of Trustees. *See* Harrison Depo. at 96:16-20. Defendants' contention that TAPP was asked to act as a lead plaintiff in the action has no support in the facts brought out by Mr. Harrison's testimony. *See* Def. Mem. at 7.

caused TAPP's losses. Harrison Depo. at 100:9-101:24. Mr. Harrison further testified that TAPP purchased its KVH stock through investment managers who were duly authorized to make investment decisions for TAPP. Harrison Depo at 39:13-41:7.

Finally, two of TAPP's senior executives, Mr. Metzinger, and Mr. Harrison, each provided answers to Defendants' lengthy interrogatories. Harrison Depo. at 28:3-31:11.[5] TAPP also complied with Defendants' discovery requests and provided 162 pages of responsive documents, including stock trading records, banking records and investment policies. Harrison Depo. at 25:7-26:8. *See In re Ins. Mgmt. Solutions Group, Inc. Sec. Litig.*, 206 F.R.D. 514, 517 (M.D. Fla. 2002) ("The courts look more at the willingness of the class representative to participate in the action. This willingness, however, may be expressed merely by the class representative's compliance with discovery requests such as answering interrogatories or showing up for a deposition and answering questions.").

Contrary to Defendants' self-serving and editorialized version, Mr. Harrison's testimony on behalf of TAPP clearly establishes an identity of issue and an absence of conflict, with other members of the Class. Despite extensive class discovery Defendants have not demonstrated that TAPP has even remotely "'given the sort of false, misleading or contradictory testimony with regard to the basic issues of the case that might make its claims subject to unique defenses and thereby undermine their ability to adequately represent the class.'" *Kinney*, 2002 U.S. Dist. LEXIS 18628, at *16 (quoting *County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1407, 1416 (E.D.N.Y. 1989)).

---

[5] Defendants' contention that TAPP failed to answer an interrogatory directed to the circumstances leading to its involvement in this case is unfounded. *See* Def. Mem. at 9. TAPP's response to the interrogatory was in the form of an objection because it sought the disclosure of information protected by the attorney-client privilege, the work product doctrine, and/or other privileges or immunities. In any event, Mr. Harrison fully answered questions on the same topic during his deposition. *See* Harrison Depo. at 95:24-99:10.

Indeed, TAPP's continued active participation in the case provides further assurance that ***TAPP has not abdicated oversight of this litigation to counsel*** and that TAPP is not a "mere alter ego" for class counsel. *See Rosen v. Textron, Inc.*, 369 F. Supp. 2d 204, 215 (D.R.I. 2005) (holding that Plaintiff's (a Teamster pension fund) participation in discovery demonstrated its adequacy and stating "[Plaintiff] has demonstrated his involvement by 'among other things, taking the time to travel to New York to give deposition testimony and answering defendants' other discovery requests.'") (internal quotations omitted.); *see also Fulco v. Continental Cablevision, Inc.*, No. 89-1342-S, 1990 U.S. Dist. LEXIS 11393, at *3 (D. Mass. June 19, 1990).

Defendants' sole challenge to TAPP's adequacy as a class representative rests on TAPP's knowledge of the details of the litigation, which this Court has found to be an inadequate basis for disqualifying class representatives. *Kinney*, 2002 U.S. Dist. LEXIS 18628 at *16 ("[I]n the context of complex securities litigation, attacks on the adequacy of the class representative based on the representative's ignorance . . . are rarely appropriate"); *see also County of Suffolk*, 710 F. Supp. at 1416. In making this argument, Defendants distort the record and pull snippets of certain portions of Mr. Harrison's answers to questions concerning, among others, the venue of the case, the specific identity of the individuals named in the suit and other details.[6] *See* Def. Mem. at 6-9.

---

[6] For example, Defendants completely distort the record of Mr. Harrison's deposition by representing that TAPP "admitted that the figure it supplied in its motion for appointment as lead plaintiff with respect to [TAPP's] KVH holdings is inaccurate." Def. Mem. at 9. There was no such admission. Each of TAPP's Class Period purchases and sales of KVH common stock were accurately included in an attachment to TAPP's original certification entitled "Schedule A." During discovery, TAPP subsequently provided trading records in support of each transaction included in Schedule A. The record of Mr. Harrison's deposition identifies no discrepancy between any of TAPP's purchases and sales as listed in "Schedule A" and the underlying trading records provided during discovery. Additionally, Mr. Harrison, on behalf of TAPP, makes no admission as to the accuracy of these records. Instead, Matthew Baltey, the examining attorney on behalf of Defendants, attempted to conjure a discrepancy by asking Mr. Harrison to reconcile TAPP's trading records to the figures presented in an entirely separate document: a spread-sheet calculation of TAPP's estimated losses, which TAPP had also provided in support of its lead plaintiff motion. The spread-

Defendants' 'cherry-picking' of Mr. Harrison's responses can be discounted for the self-serving device that it is. For example, Defendants contend that Mr. Harrison "demonstrated a complete lack of knowledge of the prosecution of the case. For example TAPP's designee did not know if Lerach would be compensated for its efforts." *See* Def. Mem. at 7. In fact, Mr. Harrison simply testified that he was not aware of any specific agreement governing legal fees and expenses in this case. *See* Harrison Depo. at 15:4-13. Defendants know, because they have received a copy of it, that TAPP retained Lerach Coughlin and has a retention agreement with it that provides the details of the representation.

Based on these distortions, Defendants wrongfully conclude that "this [purported] lack of knowledge evidences an abdication of oversight." Def. Mem. at 7. However, the majority of courts, including this Court, disagree. *Kinney*, 2002 U.S. Dist. LEXIS 18628, at *18-*16 ("Defendants contend that Plaintiffs are ignorant of many of the fundamental aspects of the case and have abdicated all decision-making authority to their attorneys, further rendering them inadequate as class representatives. ***This argument too is without merit.***") [Emphasis added.] (internal quotations omitted); *See Ins. Mgmt. Solutions*, 206 F.R.D. at 517 ("The law does not require that [plaintiff] understand the details and means by which the Defendants perpetrated the alleged fraud. . . . Minimal actions such as having read the complaint and asserting that a wrong occurred, although not understanding the exact nature of the wrong, may constitute a sufficient showing of lack of total

---

sheet calculation estimated losses on a "FIFO basis" and excluded from the loss calculation TAPP's sales of 4,875 KVH shares sold during the Class Period. A footnote listed in the spread-sheet indicated that TAPP had purchased these 4,875 shares prior to the Class Period. When asked at the deposition, Mr. Harrison testified that he did know who prepared the loss spread-sheet. *See* Harrison Depo. at 81:1-82:7. Mr. Harrison also testified that, "It appears [the sales listed on the loss spread-sheet were] not complete." *Id.* at 83:23. Far from being an admission to any inaccuracy, Mr. Harrison's testimony merely acknowledges his unfamiliarity with methods for estimating loss calculations in the context of a lead plaintiff motion, which has absolutely no bearing on TAPP's ability to serve as a class representative.

abdication to counsel."); see also *Cheney v. CyberGuard Corp.*, 213 F.R.D. 484, 495 (S.D. Fla. 2003) (noting, in securities fraud action, that where the class is represented by competent counsel, class certification should not be denied simply because of a perceived lack of subjective interest on the part of the named plaintiffs) (quotations and citations omitted).[7]

In sum, as set forth herein, TAPP has demonstrated a sufficient knowledge of this case and its ability to direct Class counsel thereby establishing its adequacy to serve as Class Representative.

### 2. Irving S. Braun Is Adequate And Typical To Serve As Class Representative

#### a. Mr. Braun Demonstrated A Detailed Understanding Of The Case And His Role And Responsibilities

Plaintiff and proposed Class Representative Irving S. Braun is an individual investor who together with his wife, Judith Braun (the "Brauns"), purchased 300 shares of KVH common stock in KVH's February 10, 2004 secondary offering and incurred losses of more than $2 per share when these same shares were sold on February 20, 2004, one day after KVH's negative earnings

---

[7] To support these contentions Defendants rely on non-binding authority that is easily distinguishable from the facts at issue here. The cases cited by Defendants included findings well beyond a mere unfamiliarity with details of the litigation *See* Def. Mem. at 5 relying on *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 185 F.R.D. 172, 175 (S.D.N.Y. 1999) (inadequacy found where choice of counsel was previously sanctioned in same case), Defendants here have offered no evidence that TAPP is merely lending its name to this litigation, nor have Defendants challenged the adequacy of Plaintiffs' choice of Class counsel. *See also Beck v. Status Game Corp.*, No. 89 Civ. 2923 (DNE), 1995 U.S. Dist. LEXIS 9978 (S.D.N.Y. July 14, 1995) (inadequacy found where plaintiff was not even aware that he was a named plaintiff in this action "until two years after this action was filed."). In addition, as evidenced by Mr. Harrison's testimony TAPP's involvement in this litigation is based on its fiduciary responsibility to seek recovery for its members and not "solely" on what it has been told by counsel. *See Kelley v. Mid-America Racing Stables, Inc.*, 139 F.R.D. 405, 409 (W.D. Okla. 1990) (finding inadequacy where plaintiffs knowledge of the case "appears to come entirely from their counsel."). Nor have Defendants' shown any evidence that TAPP was solicited to participate in this action. *See Griffin v. GK Intelligent Sys.*, 196 F.R.D. 298, 302 (S.D. Tex. 2000); *see also Rolex Employees Retirement Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 666 (D. Or. 1991) (where finding of inadequacy was based on plaintiff not becoming involved in the case until after the basic groundwork had been laid).

announcement for fourth quarter 2004 caused the price of KVH common shares to decline. *See* Deposition Transcript of Irving S. Braun, March 29, 2006 ("Braun Depo.") at 95:8-99:21; 182:23-183:23. (Excerpts from Mr. Braun's deposition are attached hereto as Exhibit B.)

During the deposition Mr. Braun demonstrated that he understood the nature of the action, *see* Braun Depo. at 72:24-75:20; 81:22-83:3; 140:14-142:10; 172:19-175:19, and his role as a class representative, *see* Braun Depo. at 134:25-135:22; 139:7-140:19; 157:19-160:11; 165:4-167:14; 168:16-23; 184:3-185:4, that he regularly reviewed and approved filings in the case, *see* Braun Depo. at 32:8-33:20; 51:8-52:20; 125:18-126:20; 129:7-130:21; 133:9-134:24 and regularly conferred with counsel to stay abreast of developments in the action, *see* Braun Depo. at 108:3-109:2; 116:21-119:11; 161:13-164:25. Mr. Braun fully participated in the discovery process: formulating answers to interrogatories, *see* Braun Depo. at 46:21-50:25 and producing responsive documents, *see* Braun Depo. at 38:2-40:18. Mr. Braun produced more than 1,900 pages of documents responsive to Defendants' requests.

Defendants have produced absolutely no evidence that Irving Braun's interests conflict with those of the Class he has been proposed to represent. Furthermore, Mr. Braun's active and continuous involvement in this litigation qualifies him to serve as a class representative. *See Rosen.*, 369 F. Supp. 2d at 215; *see also Fulco*, 1990 U.S. Dist. LEXIS 11393, at *3.[8]

---

[8] In support of Defendants' contention that Mr. Braun is an inadequate representative the only authorities cited by Defendants: *Griffin*, 196 F.R.D. at 302 and *Kelley*, 139 F.R.D. at 410 are inapposite to the facts concerning Mr. Braun's involvement in this litigation. In *Griffin*, the court found that the proposed class representative had interests at conflict with the class, here there has been no evidence produced of a conflict between Mr. Braun's interests and any member of the proposed class. In *Kelly*, the court found that plaintiff had "no basis for his involvement in the lawsuit other than what has been told him by counsel," by contrast Mr. Braun's initial involvement in the lawsuit was based on his own research, and that of his broker, of KVH's negative earnings announcement which immediately preceded Mr. Braun's decision to sell shares of KVH that he had purchased in KVH's secondary offering. *See* Braun Depo. at 95:8-99:21; 182:23-183:23.

**b. Mr. Braun's Claims Are Typical of the Claims of the Proposed Class**

The third requirement of Rule 23(a) is that the claims asserted by the proposed class representatives be typical of the claims of the class. "'The typicality requirement is satisfied when the [named] plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, and when the plaintiff's claims and those of the class are based on the same legal theory.'" *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 260 (D. Mass. 2005) (quoting *Guckenberger v. Boston Univ.*, 957 F. Supp. 306 (D. Mass. 1997) (internal citation omitted)). "As with the commonality requirement, the typicality requirement does not mandate that the claims of the class representative be identical to those of the absent class members." *Id.*

Defendants argue that Mr. Braun is atypical of other class members because he sold his shares before the end of the Class Period and will be unable to prove damages, thereby subjecting him to a "unique defense." Def. Mem. at 12-16. In this regard, Defendants point to the Complaint and note that it alleges a single corrective disclosure at the end of the Class Period. Defendants, however, are wrong on the law and the facts.

As an initial matter, the fact that Mr. Braun may be different than some class members does not render him atypical. Indeed, the First Circuit has recognized, classes are routinely certified where common issues predominate even though individual issues exist with respect to other matters such as affirmative defenses or damages. *Smilow*, 323 F.3d at 39. Courts traditionally have been reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members. *Id., see, e.g., Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992) ("Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations has not prevented certification of class actions in securities cases.") (internal quotation omitted); *Cameron v. E.M. Adams & Co.*, 547 F.2d 473, 478 (9th Cir. 1976) (same).

Instead, where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses. *See, e.g., In re Visa Check/Mastermoney Antitrust Litig.*, 280 F.3d 124, 138-40 (2d Cir. 2001); *Hoxworth,* 980 F.2d at 924; *Cameron,* 547 F.2d at 477-78. Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class. *Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)*, 148 F.3d 283, 315 (3rd Cir. 1998).

Here, Defendants' argument fails, in the first instance, based on the complete absence of any factual record which establishes that Mr. Braun's sale is in any way atypical of sales by other Class members. On the same day that Mr. Braun sold, more than 2.2 million shares of KVH common stock changed hands, the single highest daily volume of trades, excluding the day of the secondary offering, in the previous six months. Based on the facts before the Court, rather than rendering him atypical, Mr. Braun's reply to a loss causation defense focusing on the events of February 19-20, 2004, would mirror that of a significant segment of the proposed Class.

Moreover, Mr. Braun would have little difficulty in overcoming this so-called 'unique defense': KVH's February 19, 2004, public announcement linked "weak [4Q 2003] bottom line results" to "high initial production costs of the [A5]" (*see* ¶70) which clearly demonstrates that certain negative information about the A5 leaked out during the Class Period establishing a causal connection between the alleged misrepresentations and Mr. Braun's loss.[9] Accordingly, Mr. Braun would be able to demonstrate loss causation and is not atypical based on the facts alleged in the Complaint.[10]

---

[9] "¶__" denotes references to paragraphs of Plaintiffs' Consolidated Amended Class Action Complaint (the "Complaint") filed with the Court on November 19, 2004.

[10] Publicly available trading data for KVH common stock document indicates a cumulative decline of $2.94 per share for February 19-20, 2004. While Plaintiffs' Complaint, drafted pre-*Dura*, does not explicitly plead the February 19, 2004 KVH press release as a disclosing event, such allegations

In addition the authorities cited by Defendants' actually support this conclusion. The Defendants' "unique defense" argument rests on nothing more than Mr. Braun's sale of stock while the authorities cited required "peculiar" and "individual" characteristics to determine that a plaintiff's claim was atypical of the class. For example, the decision in *Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) turned on the fact that the plaintiff was a "sophisticated investor," and was not based simply on the sale of stock through a public market. *See also Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) ("Here, Hanon's unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class."); *J. H. Cohn & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 998 (7th Cir. 1980) (class certification denied where plaintiff was a sophisticated investor very familiar with financial statements). Thus the authorities cited by Defendants actually support Braun's typicality as a class representative given the absence of the peculiar and individual characteristics noted in *Warren*, *Hanon* and *J. H. Cohn & Co.*

### 3. TAPP And Mr. Braun Have Fully Participated in Class Certification Discovery

Throughout their memorandum, Defendants contend that Plaintiffs have failed to engage in discovery and the discovery provided has been incomplete. Def. Mem. at 8-10. Other than their criticisms, Defendants do not explain exactly what Plaintiffs have not done and how it is relevant to this motion. To the contrary, Plaintiffs have produced thousands of pages of documents, answered extensive interrogatories (more than 40) and sat for depositions. Simply because the answers have not been exactly what Defendants might have liked, does not mean that Plaintiffs have failed to meet their obligations. Notably, other than making comments in their submission, Defendants did not

---

can easily be added to the Complaint, should the Court deem it necessary. Trading date for KVH common stock for the period January 5, 2004 to July 9, 2004 is attached hereto as Exhibit C.

move to compel Plaintiffs to produce documents or otherwise indicate any substantial dissatisfaction with Plaintiffs' discovery responses during class certification discovery. Plaintiffs respectfully submit that this is because they have fully and adequately complied with their discovery obligations.[11]

### C. It Is Premature To Exclude So-Called "In-And-Out Traders" From the Proposed Class

Defendants improperly seek to limit the Class by excluding from the Class any members of the Class that sold their entire investment in KVH prior to the end of the Class Period. Defendants posit that the Complaint contains a single corrective disclosure and, therefore, under *Dura*, Class members that sold before the end of the Class Period cannot prove loss causation. Def. Mem. at 16.

Defendants, however, over-look key disclosures that also caused damage to shareholders. Although these disclosures are not pled in the Complaint, Plaintiffs are entitled to prove them through discovery to establish who was damaged by Defendants' fraudulent scheme. *See Tyco*, 2006 U.S. Dist. LEXIS 38901, at *22-*23. In *Tyco*, Judge Barbadoro rejected a similar argument to that made by Defendants here and held that the issue of loss causation was not properly considered on a motion for class certification. More importantly, Judge Barbadoro held that plaintiffs could establish additional corrective disclosures that were not detailed in their complaint when seeking to prove which Class members were damaged during the Class Period. Judge Barbadoro stated:

> Tyco's argument for the immediate exclusion of class members who sold their stock before the first corrective disclosure alleged in the complaint is based on the faulty premise that loss causation must be pleaded with particularity. Disputes about loss causation turn primarily on questions of fact. *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003). Moreover, unlike elements of a § 10(b) claim such as fraud and

---

[11] Defendants' contention that TAPP has not demonstrated its willingness to participate in this litigation as evidenced by its failure to produce certain documents considered by Defendants to be responsive to their documents requests is unfounded. *See* Def. Mem. at 8. During the course of Mr. Harrison's deposition certain documents that were not produced by TAPP during the course of its rolling production were identified by Defendants. TAPP has agreed to produce these documents.

> scienter, neither Federal Rule of Civil Procedure 9(b) nor the Private Securities Litigation Reform Act require that securities fraud plaintiffs plead loss causation with specificity. *Dura*, 544 U.S. at 347. Instead, the complaint need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* The plaintiffs have satisfied this requirement by pleading that their claimed losses were caused by corrective disclosures. ***That they have specifically identified certain corrective disclosures in the complaint does not preclude them from later identifying additional disclosures. Thus, it is too early in the litigation to exclude former shareholders from the class simply because their losses were caused by corrective disclosures that have not yet been specifically identified.*** [Emphasis added.]

Here, Plaintiffs will be able to point to several "partial-disclosures" before the end of the Class Period which caused the price of KVH common stock price to decline and which partially revealed problems with the A5. For example, in addition to the February 19, 2004 partial disclosure discussed above, at least two additional events caused the alleged inflation in KVH common stock prices resulting from Defendants' misrepresentations related to the A5 to dissipate, in part, prior to the end of the Class Period: 1) on January 6, 2006 KVH announced that it expected to report a 4Q 2003 earnings miss. ¶60. In particular, KVH stated that it expected to report 4Q 2003 revenues of approximately $15.6 million to $15.9 million, below revenues of $18.2 million estimated by analysts and a Q4 2003 net loss in the range of ($0.11) to ($0.14) per share, below analysts' estimates of a $0.02 net profit; and 2) on March 30, 2006 a report by market analyst C.E. Unterberg Towbin, analyst James McIlree, stated that recent visits to chain stores indicated weak sales of the A5 to the broader market. Each of these statements was followed by a price decline in KVH shares. The January 6th decline was $2.35 per share and the March 31st decline was $1.59 per share. (See Exhibit C.)

These disclosures demonstrate that Class members that sold prior to the end of the Class Period likely suffered damages as a result of Defendants' fraudulent scheme and that it would be premature to limit the Class at this time. *Tyco*, 2006 U.S. Dist. LEXIS 38901, at *22-*23.[12]

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court to enter an order: (1) allowing this action to be maintained as a class action pursuant to Rule 23(b)(3); (2) certifying a class consisting of all persons and entities who purchased KVH securities during the Class Period, and were damaged thereby; and (3) certifying Lead Plaintiffs as the Class Representatives.

DATED: July 11, 2006

Plaintiffs,
By their Attorneys

BARRY J. KUSINITZ (No. 1404)
155 South Main, Street, Suite 405
Providence, Rhode Island 02903
Telephone: 401/831-4200
401/831-7053 (fax)

Liaison Counsel

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
RUSSELL J. GUNYAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

[12] In addition Defendants' primary reliance on *In re CornerStone Propane Ptnrs*, No. C 03-2522 MHP, 2006 U.S. Dist. LEXIS 25819 (N.D. Cal. May 3, 2006) is entirely unavailing. There plaintiffs did not propose (or argue) that there were additional "corrective" disclosures to those alleged in their amended pleadings.

Lead Counsel For Plaintiffs

LAW OFFICES OF CURTIS V. TRINKO
CURTIS V. TRINKO
16 West 46th Street
New York, New York 10036
Telephone: 212/490-9550
212/986-0158

Attorney for Plaintiffs

**Certification**

I hereby certify that I mailed the above, together with attached exhibits, to Brooks R. Magratten, Esq., Vetter & White, Incorporated, 20 Washington Place, Providence, RI 02903, and Brandon F. White, Esq., Foley Hoag, LLP, 155 Seaport Blvd., Boston, MA 02210, by regular mail, postage prepaid, on this 11th day of July, 2006.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

SEKUK GLOBAL ENTERPRISES, )
On Behalf of Itself and All)
Others Similarly Situated, )
Plaintiffs, )
vs. ) Civil Action No.
KVH INDUSTRIES, INC., ) 04-306 ML
MARTIN A. KITS VAN )
HEYNINGEN, and ) Pages 1 - 149
PATRICK J. SPRATT, )
Defendants. )

\- - - - -

DEPOSITION OF DALE HARRISON

Washington, D.C.

April 20, 2006

The deposition of DALE HARRISON was convened on Thursday, April 20, 2006, commencing at 9:03 a.m., at the offices of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, 1100 Connecticut Avenue, NW, Suite 730, Washington, DC, before Paula G. Satkin, Registered Professional Reporter and Notary Public.

Job No. 22-77201

A P P E A R A N C E S

ON BEHALF OF THE DEFENDANTS:

MATTHEW C. BALTAY, ESQUIRE
FOLEY HOAG
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1000

ON BEHALF OF THE PLAINTIFFS:

RUSSELL J. GUNYAN, ESQUIRE
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
58 South Service Road
Suite 200
Melville, New York 11747
(631) 367-7100

under further consideration.

MR. BALTAY: Okay. Thank you.

BY MR. BALTAY:

**Q. Mr. Harrison, besides the agreement you have just mentioned, are there any other agreements between The Plan or TAPP and the Lerach law firm?**

A. Not that I'm aware of.

**Q. Are there any agreements governing this litigation? And I'm thinking of retainer agreements between the Lerach law firm and any plaintiff?**

A. I don't believe so.

**Q. If there is ever settlement or favorable jury verdicts would Lerach be compensated for its efforts?**

A. I don't know. I saw the agreement, but I don't know -- I don't know the initial agreement terms.

**Q. When you say you saw the agreement, which agreement are you referring to?**

A. The initial portfolio monitoring agreement. That's the only agreement I've ever seen, but I don't know the content.

**mean the International Brotherhood of Teamsters.**

A. That is correct.

**Q. Mr. Harrison, what is a teamster?**

A. A teamster is a dues paying member.

**Q. And what profession does a teamster generally hold?**

A. They hold professions from A to Z, from accountants to zoo keepers.

**Q. What is TAPP?**

A. TAPP is a pension plan which is the fund administered by our department that provides a pension benefit for a teamster officer or an entity on staff at an affiliate of the teamsters.

**Q. So how does it work? The teamsters pay money in and the money is in invested? If you could just briefly tell us how that works?**

A. Sure. The plan was established in 1962. Monies were collected, invested, and if you earned a service credit then you were afforded a pension payment as you retired or drew your pension. That continues to this day.

Q. **Who are TAPP's current trustees?**

A. The three trustees are C. Thomas Keegel, Les Singer, John Murphy.

Q. **And how do you characterize TAPP's relationship with IBT?**

A. We are just an administrative arm of the International Brotherhood of Teamsters that oversee the pension plan.

Q. **Does IBT have any other pension plans or any other similar investments accounts?**

A. Yes. For the staff we have a pension plan and it's entitled the International Brotherhood of Teamsters Retirement and Family Protection Plan.

Q. **Other than that plan is there any other plans?**

A. No other pension plans.

Q. **Mr. Harrison, have you ever been deposed before?**

A. No.

Q. **Have you ever testified in court before?**

A. No.

Q. **Have you ever been involved in any**

A. I did not.

**Q. Do you know if someone at TAPP may have seen this before yesterday?**

A. It's possible my boss, Tom Metzinger, may have seen this, but that would be guessing.

**Q. Drawing your attention to page 7 of this document which lists the actual requests for production of documents, do you know if a search was made at TAPP for documents requested?**

A. Yes.

**Q. Who undertook that search?**

A. That would be me.

**Q. Where did you search for these documents?**

A. In the office we have files and we actually have a file under Lerach, and under that would be documents. We are transitioning so we have things in boxes all around. So I was able to locate anything that pertained with that acronym KVH in a specific area, two spots, and brought those together. But other than just strictly pulling them together, not reviewing them.

Q. Do you believe that you located all responsive documents?

A. I feel we did.

Q. So are there places that you would still like to search that you haven't, or do you think you've pretty much exhausted your search?

A. No. I believe we're fairly organized.

Q. I have here, Mr. Harrison, documents produced by your lawyers in this case, Bates labeled TAPP 000001 to TAPP 000137. That is everything that your counsel has produced. I don't know if you want to flip through that.

And the question is is this everything TAPP has located responsive to these requests?

A. It looks to be about the right size, yeah. The bank statements, Amalgamated Bank of New York, I recognize those. More bank information. Actually this is -- yes. That's bank information.

Investment policy guidelines. I recognize those, two sets of them. Yes.

The Complaint. I saw that.

BY MR. BALTAY:

**Q. So, Mr. Harrison, would TAPP have these documents in its offices?**

A. Yes. We should have those.

**Q. Is there a reason why you did not collect those?**

A. I was not advised to present those.

**Q. So were you advised to specifically overlook that request number 15?**

MR. GUNYAN: Objection.

THE WITNESS: No. I was asked only to gather documents regarding the KVH Industries.

BY MR. BALTAY:

**Q. Okay. Mr. Harrison, we can put TAPP Exhibit 2 aside.**

MR. BALTAY: Can we please mark these TAPP 3 and 4.

(TAPP Exhibit Numbers 3 and 4 were marked for identification.)

BY MR. BALTAY:

**Q. Mr. Harrison, you've just been handed two documents marked TAPP Exhibit 3 and**

4. Would you kindly review these and tell me if you recognize these documents?

A. These are interrogatories, PLAINTIFF INTERROGATORIES AND SUPPLEMENTAL RESPONSES.

Q. Are these the plaintiff's responses to the interrogatories asked by defendants in this case?

A. Yes.

Q. Drawing your attention to page 7 and 8 of Exhibit 4, which are plaintiff's supplemental responses to the interrogatories.

Can you tell me who at TAPP supplied information regarding the answers to these interrogatories?

A. I'm sorry, what page?

Q. 7 and 8?

A. Page 7 and 8.

Q. The very bottom of 7 and top of 8, or you can answer from your own knowledge?

A. Okay. I see. The responses would have been provided by, looks like Tom Metzinger.

Q. And anyone else? I notice that the answer states Dale Harrison, assistant

**director of investment and pension administration also supplied information and/or participated in the preparation of the answers to these interrogatories; is that correct?**

A. Yes.

**Q. Is it correct that Thomas Metzinger and Dale Harrison are the ones from TAPP who provided information regarding these answers?**

A. Yes.

**Q. Did anyone else from TAPP provide information regarding the responses to these interrogatories?**

A. Well, our procedure would be to contact our trustees and Plan counsel. Possibly they directed back an answer. Tom acting as the administrative manager.

**Q. When you say you would contact, you said counsel?**

A. Yes.

**Q. Who would that be?**

A. Our Plan counsel for the fund.

**Q. Who is that?**

A. That would be Brian O'Dwyer and

John Wood.

Q. **Where are they located?**

A. New York and Washington, D.C.

Q. **Do you recall having done that in this case?**

A. I personally don't recall. Protocol, perhaps.

Q. **Do you know if Tom Metzinger did that?**

A. Offhand, I don't. That would be procedure.

Q. **I notice that some of the interrogatory answers -- some of the interrogatories are left unanswered, such as request -- interrogatory number 1E on Exhibit 3, which asks TAPP to set forth the circumstances leading to its involvement in this case. Is there a reason why such information would not have been provided?**

A. Matthew, what page? Exhibit 3?

Q. **Exhibit 3 on page 5?**

A. I'm still not clear. Exhibit 3, page 5?

Q. **Page 5, interrogatory 1E asks --**

A. Okay.

Q. -- asks TAPP to state the circumstances leading to its involvement in this action. And I note the answer on page 6 does not provide an answer to that?

A. Okay. I see.

Q. And the question is is there a reason why such information would not have been provided?

A. I don't know.

Q. Drawing your attention to the response to interrogatory number 1.

A. Uh-huh.

Q. On page 6 of Exhibit 3. The answer states that TAPP is a pension fund with over $800 million in assets. I notice that The Plan description provided in the documents produced lists The Plan assets at $500 million and another at 600 something million. Which figure is the current figure?

A. The more accurate one would be between 500 and $620 million.

Q. Why does the answer list the assets at over $800 million?

401(k). I'm not involved in the day-to-day investments.

**Q. Reverting to Exhibit 1 in this deposition, which is the 30(b)(6) Deposition Notice to TAPP, drawing your attention to page 4, the third topic of testimony. Here TAPP is directed to produce someone for deposition today who is knowledgeable on TAPP's investment policies or practices.**

**Are you knowledgeable on that or not?**

A. Yes.

**Q. How do TAPP's investment advisors decide what equities to invest in?**

A. They are hired by The Plan based on parameters that we have chosen them to invest in. For example, they could be a large cap fixed income or high yield bond manager that we require certain criteria of investment grade quality to purchase on.

As to an equity manager, their decision-making, again, must fall within our guidelines, but they have the free rein to choose as they see fit with the intent to

improve their performances. They are obviously paid based on market value.

Q. **Do they pick stocks on an individual basis or do they look to buy stocks within a certain basket? Do they try to replicate the NASDAQ market?**

A. No. They're purchasing individual stocks.

Q. **What do they base those decisions to purchase on; do you know?**

A. I don't know.

Q. **What input does TAPP have in the decisions to make individual stock investments?**

A. We do -- The Plan does not recommend individual stock selection. We leave that to the discretion of the investment managers. They, again, follow their chosen asset allocation parameters that we were hired -- they were hired to do so.

Q. **Do they -- while they make the recommendation or decision, do they run the investment decisions by TAPP?**

A. No, they do not.

Q. **What are the guidelines in place**

for the investment managers who purchase KVH stock for TAPP?

A. The guidelines would, again, fall under the policy guidelines provided to them. They would have a specific agreement between The Plan and the firm, their firm, again, bound by the parameters that they were so hired to do.

Q. I have here again something we looked at before. These are the documents Bates labeled TAPP 1 through 187. Do you see the documents you've just referenced, namely the agreements or guidelines that governed the investment managers in this case who purchased KVH stock for TAPP?

A. I do.

Q. Refreshing your recollection from that document are those -- which document are you referring to?

A. These are the statement of investment policy objectives and guidelines for The Plan.

Q. So using that document to refresh your recollection, what are the guidelines guiding the actual investment advisors who

BY MR. BALTAY:

Q. **Mr. Harrison, you've just been handed a document marked TAPP Exhibit 7. Could you kindly review this and let me know if you recognize this document?**

A. This is a document that The Plan, as it says, it's supporting the appointment as being lead plaintiff, and then approving the selection of Lerach Coughlin as lead counsel. And it appears to be the accompanying documents in support.

Q. **So is this TAPP's memorandum in support of its Motion For Appointment As Lead Plaintiff and approval as Lerach as lead counsel?**

A. Yes.

Q. **If you would turn to Exhibit A of this document, which is about 15 or so pages in?**

A. Uh-huh.

Q. **Do you recognize this as a certification of TAPP?**

A. Yes, I do.

Q. **Who signed this on TAPP's behalf?**

A. C. Thomas Keegel, who is a plan

trustee.

Q. I note under point 6 of this certification that TAPP may expect to recover reasonable costs and expenses, including lost wages directly relating to the representation of the class. Would that include your time spent on this matter?

A. I suppose.

Q. What other costs and expenses would TAPP expect to recover?

MR. GUNYAN: I object. This line of questioning calls for a legal conclusion. The certification, which was signed, calls for the reimbursement of reasonable costs and expenses. An application can be made for costs TAPP incurs in connection with the litigation, and a judge can opine. So whether or not a reasonable cost or expense will be reimbursed is -- calls for a legal conclusion. I think it's beyond the scope.

BY MR. BALTAY:

Q. Let me clarify my question then.

Mr. Harrison, I'm not asking you to make a legal judgment as to what costs may or

**Q. So is it your testimony you don't know the answer to that question?**

A. It's in our -- we have a fiduciary responsibility to try to recoup any losses. And if The Plan has lost $730,000 for our members that's our obligation to get that back.

**Q. But you don't know what portion of that you allege KVH to be responsible for; do you?**

A. Again, I would defer to Plan counsel and trustees for guidance.

**Q. Mr. Harrison, I would like to direct your attention to Exhibit B to this document, which is 20 or so pages in. What is this document?**

A. This would be a -- let's see here. I can't read the first part. Something purchases and losses. Teamster Affiliates Pension Plan.

It appears to be a summary of purchases and sales, which is a -- it indicates over the time period from October of 2003 to June of '04 there were 65,000 shares purchased at a cost of 1. -- 2.79 million. It looks like

all shares were sold out in July of 2004 and the sale proceeds leaving a loss of $730,000 to The Plan.

**Q. Who prepared this document?**

A. I don't know. It would appear to be a summary of the bank statement that would be supported. I did not prepare this.

**Q. So would each of these purchases and sales be reflected in the trading records that we looked at earlier?**

A. It looks like the trading records we looked at earlier were in '04 to August of '05. You could cross-reference these. It looks like the '03 trades would not be reflected there.

**Q. Would the '04 trades be reflected in the trading records?**

A. I would say so.

**Q. Could you locate, for example -- do you see the trade on the right-hand side of this Exhibit B, which is -- looks like 7/13/2004?**

A. Uh-huh.

**Q. 1,329 shares sold?**

A. Yes.

Q. **1,329 shares sold. Could you locate that in the trading records now? I assume you're looking at Exhibit 5?**

A. Yeah, Exhibit 5. See if I can find it.

I'm not tying into that number anywhere.

Q. **For example, you don't see that sale listed in the trading records?**

A. I don't see it.

Q. **Why would that be?**

A. I don't know. I see the other two, but I don't know about the other.

Q. **You don't see the July 13, 2004 sale of KVH stock?**

A. Not in Exhibit 5.

Q. **Does that suggest to you either that this Exhibit B to TAPP Exhibit 7 is inaccurate, or that the trading records are either inaccurate or missing some component of the sales?**

A. It appears they're not complete.

Q. **When you say they're not complete,**

it, but this could be resolved with bank statement reconciliation.

Q. Can you just do a simple arithmetic? You've got 65,075 shares, subtract out the 1,329, the 14,028 and the 360, don't you arrive at the 49,358 shares?

A. That's right.

Q. It is not a matter of some hidden formula in Excel, it's a matter of simple arithmetic that the sales reflected on the following Schedule A, which you say are also reflected in the trading record, are simply not reflected on the movant's purchases and losses?

MR. GUNYAN: I --

MR. BALTAY: I'm asking a simple question, he's not answering this. If he answers this we'll move on.

THE WITNESS: They were overlooked.

BY MR. BALTAY:

Q. Okay. Thank you.

All right. We can put this document aside.

Mr. Harrison, when did TAPP find

**out there was a lawsuit pending against KVH?**

A. The Plan was notified by -- and to my boss, most likely, Tom Metzinger, and I'm not certain of the year. He is the administrative manager.

**Q. When you say your boss, do you mean Tom Metzinger?**

A. Tom Metzinger, yes.

**Q. You think Tom Metzinger would have been alerted there was a lawsuit?**

A. Yeah. Documents would have come in through the office.

**Q. And who sent those documents? Is that Lerach?**

A. It's part of our agreement.

**Q. And would Lerach have asked TAPP to serve as lead plaintiff in this case?**

A. It may well make us aware of our losses, but we run it through our investment consultant and trustees to act upon it.

**Q. So the request to become involved would come from Lerach, but the decision to be involved would be made by --**

A. Ultimately by our trustees.

**Q. Is that correct?**
A. Yes.
**Q. Do you know if that was after the lawsuit had been filed?**
A. I don't know.
**Q. And who at TAPP would have made the decision to become involved?**
A. Plan trustees.
**Q. Do you know if there was ever a conference call scheduled by Thomas Metzinger to discuss this litigation?**
A. I did see documents on that.
**Q. I do not have photocopies of these to introduce as exhibits.**
**I direct your attention to your production Bates labeled TAPP 105 and subsequent pages, if you could review those to help you refresh your recollection?**
A. Yes. There was a series of faxes sent out to arrange for a conference call which was to be scheduled on September 17th, 2004 regarding a class action suit. It doesn't spell out other than the handwritten notes regarding KVH Industries.

**Q. So what do you know about this conference call?**

A. I don't know anything about it.

**Q. Did you participate?**

A. No, I did not.

MR. BALTAY: Okay. Can we take a quick break.

(A brief recess was taken.)

MR. BALTAY: Back on the record.

BY MR. BALTAY:

**Q. Mr. Harrison, do you know what TAPP did to evaluate whether or not it should join this litigation as a named plaintiff?**

A. With the investment consultant I would imagine that they looked at -- specifically at this holding, made the determination that there were huge losses to the fund, made the recommendation to the trustees, and possibly this is the nature of the conference call.

**Q. Is that your speculation that they did that?**

A. That would be -- if I was an investment consultant that's what I would do.

Q. But is it your testimony you do not in fact know what TAPP did to decide to participate as a named plaintiff in the lawsuit?

A. The decision to participate in the lawsuit would come from the trustees. How it was derived to that point, I don't know.

Q. To your knowledge was this KVH lawsuit the first lawsuit that TAPP became involved in as a named or lead plaintiff?

A. Yes.

Q. Do you know what kind of investigation into the factual allegations your lawyers made before filing any of the complaints in this case or any other court filings?

A. No.

Q. Do you know if TAPP's attorneys or if TAPP hired any investigators to look into any matters relating to KVH?

A. No, I don't.

Q. Do you know where this suit was filed? And by that I mean which court or which state even?

A. Federal Court, New York.

Q. And do you know who is being sued?

A. The industry that I know of, the company.

**Q. The company?**

A. Yeah.

**Q. Besides the company do you know who else is being sued, if any one?**

A. I don't know who they are. I see two names, but that's it.

**Q. And do you know what the basic allegations in the Complaint are, or more generally what is the substance of the grievance in this lawsuit?**

A. A lot of this is we direct to our relationship with Lerach to keep us abreast of things. And I specifically don't know the underpinnings behind the basis, other than what I just briefly picked up in the documents as we compiled them.

**Q. And I do note, reverting back to TAPP Exhibit 1 in today's deposition, this is the Notice of Deposition that -- and you've already said that you are knowledgeable with regard to, and I look at topic 4, for example, TAPP's participation in and knowledge of this**

**litigation?**

A. Uh-huh.

**Q. So is it your testimony that TAPP leaves it more or less to the lawyers to figure out what the problems are in this case?**

A. Well, I mean what I know about the case is the product, it was intriguing as an individual, a little expensive for me.

**Q. What product was that?**

A. That would have been their GPS, their satellite in order to bring down the product to your car.

**Q. What kind of product? Can you explain a little more?**

A. Satellite TV.

**Q. Satellite TV?**

A. Yeah.

**Q. Okay. And what else do you know about the case?**

A. The clippings indicated the product was delayed, but the news was hyped up to make it a good buy opportunity. Perhaps that's what our investment managers looked at, that the potential was there.

**often serve as lead plaintiff. Are you aware of concern and inquiry into those relationships?**

A. I've heard, but not specifically the details I've heard.

**Q. Has that raised any concern on TAPP's behalf?**

A. I am not aware of that.

MR. BALTAY: All right. I have no further questions at this time. I don't know if your attorney would like to follow up. If not, we will conclude.

MR. GUNYAN: I just do have a few questions, if you'll permit me.

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. GUNYAN:

**Q. If I could first refer to, I believe it's our Exhibit Number 1, although it's the -- or is it Exhibit Number 2? It's the Sekuk -- it's our response to the first set of interrogatories that's TAPP Exhibit Number 3. If we could refer to that for a moment to page number 6, and I'm referring to the paragraph**

that starts with the TAPP colon, that section there.

Previously, Mr. Harrison, you were asked about the accuracy of the number, the dollar total of assets that's represented in this answer. Can I ask you how the dollar total of assets is calculated or arrived at?

A. Yes. Essentially it's an end of the month market value based on the holdings, so it's share price or quantity times the market price, be it a stock or a bond. So that gets you to that number which, I wish it was $800 million, but it's not.

Q. So it is a market value representation when dollar million in assets are described here in this answer?

A. Yes.

Q. Does that market value vary over time?

A. It can vary over time.

Q. This document, if we now turn to the last page is page 21, excuse me?

A. Uh-huh.

Q. Is dated March 15, 2006?

A. Uh-huh.

Q. Is that correct?

A. Yes.

Q. Okay. Thank you. If we could look at some of the documents that have been -- specifically the investment policies that were produced, and I'm referring specifically to TAPP 019, which has an investment policy executive summary. There's a total of current assets listed on that page; is there not? What is that total?

A. $620 million.

Q. When $620 million is listed on there what's the basis or calculation behind that number?

A. Again, it would be based on the market value of the portfolio holdings. However, the time frame would be a moving target based on when this was compiled.

Q. Okay. And we don't have -- I know there are two of these produced, but there is no date specifically in this document with the $620 million, when this was produced, but it would reflect a market value at a given point in

# EXHIBIT B

A P P E A R A N C E S:

LERACH COUGHLIN STOIA GELLER RUDMAN
& ROBBINS LLP
Attorneys for the Plaintiff
52 Duane Street
New York, New York

BY: RUSSELL J. GUNYAN, ESQ.

LAW OFFICES OF CURTIS V. TRINKO, LLP
Attorneys for the Plaintiff
16 West 46th Street
7th Floor
New York, New York 10036

BY: CURTIS V. TRINKO, ESQ.

FOLEY HOAG LLP
Attorneys for Defendants
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2600

BY: BRANDON F. WHITE, ESQ.
-and-
KALUN LEE, ESQ.

IRVING S. BRAUN

Q. But more specifically, did you review any papers for the purpose of preparing to give your testimony today?

A. I'm not following the question.

Q. When was the last time you looked at any papers from this case that we're here on?

A. I just got copies of papers as recently as last week, I signed, you know, certifications and stuff like that.

Q. What was that?

A. I don't have it here in front of me.

Q. You don't know?

A. I mean -- I remember seeing papers, they were faxed to me and they were originally mailed to me. I looked them over, I was told to sign and I fax'd them back and I delivered it to Mr. Trinko, original signatures, and that's it.

IRVING S. BRAUN

Q. So it was Mr. Trinko who did that with you?

A. Yes.

Q. But you don't know what that item was?

A. Specifically, no. It was all related to the case as far as, you know, my responses to your -- I'm assuming your questions. So they represented the -- I think it's called the interrogatories specifically.

Q. Okay, so --

A. Again, I'm not a lawyer, I'm just an average layman.

Q. So what you're doing now is describing the time when you received my interrogatories from Mr. Trinko and you signed your answers for him?

A. Right.

Q. Okay. And that isn't exactly what I'm looking for. Let me try it this way. When you met with your attorneys did you during that meeting review any documents?

IRVING S. BRAUN

Please take a minute to look at this document.

A. Yes, I'm familiar with the document.

Q. Did you receive this from your attorneys?

A. Yes, sir.

Q. Do you know when?

A. No because I -- you know, I get them, I date it at home, that's it, you know, when I receive them.

Q. Could you look at the last page of all and the last line of the last page and see if that does anything to refresh your recollection as to when you might have gotten this?

A. It says here December 16th, 2005 is when it was mailed.

Q. Does that seem about right?

A. You know, the answer to that is probably, but, you know again, I don't have a recollection of every date I got the documents.

Q. What did you understand this

to be?

A. This was a list of queries that you wanted certain materials and certain information.

Q. And what did you do to respond to it?

A. I reviewed it and I told Mr. Trinko what I was prepared to give.

MR. GUNYAN: Could I have a moment just to speak with him?

MR. WHITE: Yes, because it's my understanding that counsel is concerned that the witness is now repeating his communications with Mr. Trinko and that's a fair reason to have a conference.

Q. So the question is simply what you did to respond to these requests for documents?

A. I called up Mr. Trinko and we reviewed it.

Q. Did you do other things to respond to the request for documents other than converse with Mr. Trinko on

IRVING S. BRAUN

the phone about it?

A. When he told me and sent me another piece of paper and said this is what we need, then I responded by preparing the documents that I actually had to submit to your firm or to the case, whatever.

Q. Where did you look for the documents to submit to me?

A. In my -- my tax records, my brokerage accounts, etcetera.

Q. Physically where were those?

A. My garage.

Q. Now, other than looking in your garage, did you look anywhere else for things to send to me?

A. No.

Q. Did you ask any lawyers who had ever represented you on any cases --

A. No.

Q. -- if they had anything?

A. No.

Q. Why not?

IRVING S. BRAUN

me your resume which you said was the reason why I shouldn't ask you about your background. Do I have that right?

A. Right.

Q. When did you produce to me your resume?

A. I gave a resume as part of my instructions.

Q. Who did you give that to?

A. To Mr. Trinko.

Q. Do you know if he gave that to me?

A. I'm presuming he did.

Q. Why are you presuming he did?

A. Because if he was asked to give it he might have given it. If he didn't give it that's something you have to ask him.

Q. Now I think you also testified earlier that you received a copy of interrogatories from me; is that right?

A. Yes.

IRVING S. BRAUN

**Q. And do you have an idea of when that was?**

A. As I said, you know, over the last 18 months I've been getting documents, so, you know, I can't tell you exactly when I get everything.

**Q. Did you work on answering those?**

A. Yes. Every time I got communication from the Law Offices of Curtis Trinko I reviewed them and either called Jeffrey or Mr. Trinko.

MR. WHITE: So let's mark as the second numbered exhibit the interrogatory answers, and I'll share an extra copy with counsel.

(Braun Exhibit 2 for identification, plaintiffs' responses and objections to defendant Martin Kits van Heyningen's first set of interrogatories to plaintiffs.)

**Q. What we have here is a copy of plaintiffs' responses and objections to defendant Martin Kits van**

IRVING S. BRAUN

Heyningen's first set of interrogatories to plaintiffs. Do you recognize this document?

A. Yes, only because I saw and I remember 27 pages on the fax, I remember that.

Q. So what is this?

A. After Mr. Trinko asked me certain questions he prepared his response to questions in the case. Specifically page by page, we have to go over them, you know, we can do that.

Q. When Mr. Trinko asked you these certain questions, was that on the phone or face to face?

A. It was always on the phone generally.

Q. Now when he was asking you these certain questions were you looking at my questions, the interrogatories, or were you just conversing with him?

A. Basically it was, you know, Mr. Trinko gave a -- gave me a question

IRVING S. BRAUN

and I responded.

Q. On the phone?

A. Yes. Or Mr. Silverstein, I should say.

Q. Mr. Silverstein did that?

A. I said, you know, sometimes Mr. Silverstein, most of the time Mr. Silverstein called, you know, sometimes Curtis called.

Q. Now, in order to give the answers to Mr. Trinko or Mr. Silverstein, did you just answer from out of your head or did you ever go and look anything up?

MR. GUNYAN: Objection; compound. Could you break that down.

Q. In order to answer the questions of Mr. Trinko, were you just giving the answers out of your head?

A. If it was something I can give out of my head I did. If it was something that was specific I would have to go research it. You know, like an actual, you know, document as far

as, you know, broker statements, things like that.

**Q. So can you give me any examples of research that you did?**

A. I told you, I went to my garage and pumped out all the files that I was told to give.

**Q. And brokerage statement is one example?**

A. Yes.

**Q. Anything else you can think of?**

A. Yes, specific trade confirmations for the stock in question.

**Q. Anything else?**

A. I'm trying to think. A resume, I was told to give a resume, I remember doing that. I pulled off and faxed that as part of the package. I was called, they asked me, you know, to give a description of my current job. I just said I'm a mortgage broker for, you know, that's it.

IRVING S. BRAUN

Q. Now, in addition to looking in your documents, whether in your garage or anywhere else, did you also ever ask anyone for any information to help you answer the questions?

A. No.

Q. Now at some point did you see the document that's in your hand now, Exhibit 2?

A. Yes, sometime -- yes, sure.

Q. That is to say my questions with the answers typed after them, that's what this is, did you see it like this?

A. Yes.

Q. Okay. Who gave you that?

A. As I said -- as I said in the beginning, I remember 27 pages because it was originally I think it was emailed to me and it was faxed to me, vice versa, one or the other and I remember 27 pages. I remember that was a lot.

Q. What did you understand to

IRVING S. BRAUN

be the purpose for your receiving this document in this form?

A. Because as a plaintiff I am supposed to be kept abreast of what's going on in the case.

Q. Is that the only purpose you understood for your receiving Exhibit number 2 in the form you're now looking at it?

A. No, I'm basically, you know, it's lawyer/client communication so I'm supposed to be getting copies of everything that's going on, generally.

Q. Did you understand it was your responsibility to make sure that everything in this document was true?

A. Yes. Yes, I looked it over and, you know, make sure that this is acceptable to me, to my knowledge.

Q. Okay. And did anyone else look it over to make sure it was acceptable to their knowledge or just you?

A. Just me.

advice?

A. I said to you that sometimes when I have an idea I do call people, yes.

Q. Sometimes you make investments without advice?

A. Yes.

Q. And what kind of research do you do when you do that?

A. I will look on line for information. I do reading, you know, periodicals. Sometimes, you know, like I said, you read something, you research it, sometimes you read it and it makes sense and you like it and you just go with it I'm saying.

Q. Now, do you know what a follow-on offering is?

A. A follow-on offering? I've heard the term. I'm not exactly sure how to define that, no.

Q. Do you know what a secondary offering is?

A. Yes.

IRVING S. BRAUN

**Q. What's that?**

A. Secondary offering is when a company has already been trading and they're looking to raise capital, okay, or equity, or, you know, and they send -- excuse me, and they ask the Street to raise funds for them.

**Q. They ask the Street to raise funds for them. What does that mean?**

A. They ask the investment bankers, Wall Street.

**Q. And then what happens?**

A. Then what happens? And they sometimes go on a dog-and-pony show and they, you know, go around selling their wares and giving, you know, you know, what do you call it, presentations. And then the stock is priced and that's it.

**Q. And in the case of KVH, was there a secondary offering?**

A. Yes, sir.

**Q. Okay. And you would call it a secondary offering, not a follow-on**

IRVING S. BRAUN

offering?

A. Some people do, but I don't use that term so that's why I said I'm not sure, you know, I've heard that. I call it secondary. Again, I'm a layman, so I...

Q. Would you consider yourself a sophisticated investor?

A. I don't think -- am I sophisticated, I don't think. I don't know what defines sophisticated.

Q. A sophisticated investor is someone who ordinarily has been investing for many years, it's often someone who has held positions such as CFO of more than one company, it's also someone very often with an accounting background, and very often someone with a personal net worth over a million dollars. So let me ask you would you consider yourself a sophisticated investor?

A. If that is the definition that you consider it, then maybe I

IRVING S. BRAUN

follow -- I follow on to that, okay.

Q. Okay. You meet those criteria that I just gave?

A. If that's what you define it as.

Q. Okay. Now, did you purchase KVH stock in a follow-on offering or secondary offering?

A. Yes.

Q. Okay. Are you able to prove that you in fact did that?

A. Yes.

Q. How could you prove that?

A. I submitted statements and confirms to document that.

Q. Okay. And have you ever previously invested in a secondary offering?

A. Yes.

Q. Now, can anybody who has the money invest in a secondary offering, or do you have to have a particular relationship with a brokerage house in order to be permitted to do that?

IRVING S. BRAUN

A. Basically what I do is when I hear about stocks or I like stocks, I told you I have certain favorites on my computer and I hit favorites and I do on-line research and, you know, sometimes if it's mentioned in anywhere else I'll follow it up. Depending on what type of investment I'm planning on doing the more extensive research I'll do, okay.

Q. **What can --**

A. I knew that I'm not going to be getting a lot of shares, he said it wasn't a big offering, so, you know, I didn't do a, you know, extensive search but I did, you know, basically go on, you know, certain sites at that time, researched it and I said okay, fine. And I -- and I basically trust Bruce. I've known him for a long time.

Q. **Can you remember anything that you learned from your own research that influenced your decision to invest in KVH's secondary offering?**

IRVING S. BRAUN

A. At that time, I remember reading that, you know, like they were coming out with -- they had a product that they were introducing to the consumer market. So, you know, to me, you know, it gave me an alertness that, you know, possible extra revenue, and when you have more revenue, you know, you can make more money on earnings per share, etcetera. So, you know, it's an investment that might -- is going to go up in trading -- play. Now you can play for a trade, you can play for an investment. I make that decision as time goes on.

**Q. What was that product?**

A. What was that problem?

**Q. Product.**

A. Product, sorry. That was a satellite antenna.

**Q. Do you remember the purpose of that satellite antenna?**

A. The purpose of the satellite antenna? It was for the consumer use

IRVING S. BRAUN

for, you know, I told you, for cars, SUVs, etcetera.

Q. **Now did you make this investment for, as you say, investment purposes or trading purposes?**

A. At that time, as I said to you, I do it as the stock trades, okay. Sometimes if, you know, the stock really pops up more than we ever think, you know, we'll trade it, you know, and take a profit. If it just gradually moves up, we wait for it, okay.

Q. **Can you remember anything that Bruce Belodoff said to you that influenced your decision to invest in KVH's secondary offering?**

A. Basically he had said that, you know, the stock had run up, you know, on anticipated -- you know, announcements that they're introducing this market, you know, it really ran up a lot. Then it came down. So, you know, it had gone from like the low teens to the high twenties or something

in your account on an unsolicited basis." Did I read that correctly?

A. You read it correctly but it's wrong.

Q. Tell me why you say that's wrong.

A. Because I remember that Bruce called me up that day and said look, you know, the secondary you bought, they have some type of a, what do you call it, statement that they put out as far as their business and he said it wasn't -- it was negative, and he says that's not why we bought it, it's exactly contrary to what we're looking for and he suggested I sell it and take a look.

Q. He told you that KVH had put out a statement about their business that was negative?

A. Yes.

Q. Do you remember what form of statement that was, whether a press release or something else?

IRVING S. BRAUN

A. The exact -- I don't remember exactly what he told me, but it must have been something that either hit the -- hit the wires or press release, okay. You know, again, but Bruce called me up to inform me, listen, I put it in the stock, this is what's happening, I think we made a mistake, I made a mistake, we made a mistake together, and I think we should get out of it and cut our losses.

**Q. In looking at the document and seeing when you sold, can you tell me when Bruce made the call you're describing?**

A. Yes, that day, the 20th.

**Q. So it was on the 20th that he said that there was a statement that had come out?**

A. Yes. He said there was something -- right.

**Q. When did the statement come out? He called you on the 20th about it. When did it come out?**

IRVING S. BRAUN

A. I would believe because I don't know if it was done in the morning or, you know, because I don't know what time of day it was transacted, okay, but it must have come out either the night before or that day and Bruce called me to alert me. If it came out the night before it was probably after trading hours so nothing could be done. If it came out in the morning Bruce called me.

**Q. Did you ever go and look at that statement that he was telling you about?**

A. Yes, I did look at it. Yes, I did look at it.

**Q. How did you get a look at that? Where did you look?**

A. What?

**Q. Where did you look in order to see this release by KVH that Bruce was describing?**

A. I believe that he pointed me somewhere to, you know, look it up on

IRVING S. BRAUN

the internet at that time, or, you know, MSN or Yahoo! at that time.

Q. **What did it say?**

A. What specifically did it say? I don't remember the exact words, but I believe that they were saying that the what do you call it, preliminary results of the, what do you call it, the antenna market they were looking was not as good as it should be. The exact words in the exact language I don't remember, but I remember it was a negative connotation to what we had gone in to do, okay. It was definitely not the reason we bought the stock to begin with.

Q. **And this -- let's call it a release, do you want to call it --**

A. I don't know if it was a warning, I don't know exactly what it was at that time, but it was something that was definitely negative in composition.

Q. **And you believe, see if I**

IRVING S. BRAUN

understand you, you believe that it came out either after the market closed the night before the 20th or else on the morning of the 20th?

A. Right.

Q. And how do you know that?

A. How I do know that? Because Bruce told me. Bruce alerted me to it.

Q. So it was your understanding that you and Bruce were getting you out of this stock right away after this KVH statement?

A. Yes, sure.

Q. As soon as possible?

A. Right.

Q. Now, when you look at the price at which you bought and the price at which you sold, did you make money or lose money?

A. I lost money.

Q. And when you look at the fact that you got out when you did, did you prevent yourself from losing more?

MR. GUNYAN: Objection;

specialties I think I should say.

Q. **So what did you find out about the case then?**

A. I found out there was other people that had bought stock that are trying to get justice from KVH for what happened.

Q. **So you found out there were cases that had been filed, more than one, right?**

A. Yes.

Q. **And what did you do about that?**

A. I told you I called Mr. Trinko.

Q. **But at some point you became more involved, right?**

A. Right, yes. Mr. Trinko sent me the papers to, you know, to like, you know, start looking it over and he informed me about the other case involved and started to send me some of the paperwork that's going on. That's how I've been, you know, getting the --

getting the communications from him.

By the way, just as a record, okay, as a clarification of something. These -- these documents, okay, I said to you they're in my garage. The reason they're in my garage, because they're tax records and boxed in storage in the -- in storage boxes, okay. The documents that I received from Mr. Trinko that the case is still open are sitting on my desk, okay. So they're not -- I don't treat them like -- I don't want the court to think that those documents are in the garage. Those are on my desk because that's an ongoing matter.

These are because tax records have to be kept for six, seven years, they're in the garage boxed because I'm an accountant by trade and I'm, you know, pretty organized.

Q. **By the way, just so we can have a clear record, take a look at number 6 there.**

IRVING S. BRAUN

at a time. Go ahead.

A. Yes.

Q. Who?

A. Mr. Trinko.

Q. When?

A. During the process of the last X amount of months when this was ongoing. This is what happened, this transpired, would you like to be a plaintiff, I said sure, okay.

Q. Did you make any study of the case before saying yes?

A. Yes, I looked over -- again, I looked over the things that had transpired from what was -- I had received from Curtis and from what I saw on public record, you know, my public record being the, you know, when you hit KVH stock you get information.

Q. What materials did you receive from Curtis Trinko that you studied when considering your decision whether to become a plaintiff in the case?

IRVING S. BRAUN

A. I believe he had alerted me to about the other case, saying that it was ongoing. Not my purchase which was in the secondary offering, but people who bought in the open market.

Q. Okay. Is it your understanding that before you agreed to be a plaintiff there were already cases pending against KVH by people who didn't purchase in the secondary offering but purchased in the open market?

A. I believe it was in the process of actually happening, yes.

Q. And was it also your understanding that there was nobody who was suing who purchased in the secondary offering?

MR. GUNYAN: Objection; calls for a legal conclusion.

MR. WHITE: Well he actually said this, I'm just trying to clarify it.

Q. Did I understand your

testimony correctly that the other cases that were in there ahead of you, they were not purchases in the secondary offering, but the open market; isn't that right?

MR. GUNYAN: Objection. It calls for a legal conclusion whether or not a stock -- he's answered that to the best of his recollection the case that he was instructed on or informed of related to open market purchases of KVH shares. Whether or not shares are purchased in a secondary offering is -- it calls for a legal conclusion.

MR. WHITE: Well one of the things I'm trying to find out here is his qualification to be the class representative. So I am checking to see how much understanding he has of the case that he brought and part of that is comparing it to the way the cases were before he was added. So I think it is very fair to see if he knows how these things work and what

these differences are. I think you should let him testify.

Q. I'm just asking you the difference between the cases that were already there versus what happened when you joined. Those weren't complaints about purchases in the secondary offering, were they?

A. Right. To my knowledge, they weren't.

Q. Okay. And do you know how many cases there were before you?

A. I just know of the pension case.

Q. Okay. Do you know the name of that?

A. Teamsters.

Q. Okay, so --

A. I think it's TAP.

Q. So before you became a plaintiff there was a plaintiff that was called TAP?

A. Again, to my knowledge, yes.

Q. And they were suing KVH, but

IRVING S. BRAUN

assume, I don't know.

Q. **Was any of the money paid them your money?**

A. No.

Q. **Did you approve the decision to hire the investigators?**

A. It was not my -- nobody asked me to hire investigators. Lawyers feel if it's necessary to do that, then that's what they have to do. I have no control over that end.

Q. **Now, you have said, I think you know there was a complaint or more than one complaint before you were named as a plaintiff, right?**

A. Right.

MR. WHITE: Let's take a look at a document which will become the next numbered exhibit. This will be marked Exhibit 7 and we'll share a copy with counsel.

(Braun Exhibit 7 for identification, class action complaint against KVH and others, stamped filed

July 21st, 2004.)

Q. And this is a class action complaint against KVH and others, and it's stamped filed July 21st, 2004. And on the last page you can see the lawyers including the Lerach firm. Do you recognize this document?

A. Yes, sir. I believe it was one of the first, if not the first, you know, communications around that time, yes.

Q. So we can call this the original complaint or the old complaint to distinguish it perhaps later from others.

Now, did you read this old complaint before you joined the suit as a plaintiff?

A. Yes.

Q. And when you read this did you have any way of knowing whether the allegations of wrongdoing were true?

MR. GUNYAN: Objection. Again, it calls for a --

IRVING S. BRAUN

trusts, okay, and he -- so I would have to go with my counsel, if my counsel feels that somebody's representing another company in a similar type of case, that's the right thing.

Q. **Okay. And did you do anything else other than what you just told me in order to satisfy yourself that the allegations of wrongdoing in the original complaint were true?**

A. Well, the numbers speak for themselves. You know, there's a lot -- you know, the financials that came out or the actual number of sales, you know, etcetera, that, you know, actually came from the A-5 were, you know, not to what they forecasted. So that's the keep thing for me, you know what I'm saying. That was the key thing.

Q. **Could you be more specific about that key thing. I'm not sure I followed you.**

A. Projections and, what do you

IRVING S. BRAUN

call it, and assertions that sales are going to be X amount of units and when the units came in they were much less than they were and had known that, you know, or should have known that when they prepared the prospectuses and alerted people to, you know, in a better fashion, yes, to me that's possibly material misrepresentation.

Q. **How many units did they project?**

A. To my knowledge at the time they were looking at about 10,000.

Q. **Where can you get that? Can you show me where that was said?**

A. I said this is -- I can't find it right now in the papers, I'll have to research it, but that's the units they were taking talking about, I believe.

Q. **You can show me that the company projected that it was going to sell 10,000 units?**

A. That's to my recollection.

IRVING S. BRAUN

MR. WHITE: Let's mark as the next numbered exhibit another complaint and share a copy with counsel.

(Braun Exhibit 8 for identification, consolidated amended class action complaint.)

**Q. So Exhibit 8 is a much thicker document, but I'm sure you can see that it is a consolidated amended class action complaint against KVH and two individuals, and if you look at the last page at the bottom you'll see -- let me ask you what are the last two lines on the last page?**

A. Signatures.

**Q. And whose signatures are those?**

A. Irv and Judy Braun.

**Q. So what is this?**

A. This is an amended complaint that has me joining with TAP as lead plaintiff.

**Q. And who drafted this**

document?

A. I'm going to assume the firm of Lerach.

**Q. Why do you assume the firm of Lerach drafted this document?**

A. Why? Because they were lead counsel for plaintiffs, and since they're above Curtis's signature, you know, I assumed they did, that's all. I got copies -- I got copies from Curtis is all I know.

**Q. Did you work on this document at all?**

A. Did I work on this document at all? At that time I believe all I had said was given some preliminary information about my, you know, stock trades at that time, I don't think there was anything that I was asked other than some, you know, questions from Curtis. I don't remember the exact details and stuff like that. But I looked it over when I got it.

**Q. Now, what is the item that**

IRVING S. BRAUN

makes up the last two pages entitled "Certification of named plaintiffs pursuant to federal securities laws" and starts off, "We, Irving S. and Judith Braun hereby certify as follows"? What is that item?

A. Reviewed the complaint and basically certifying that, you know, we are willing to serve as class representatives, etcetera, against KVH.

Q. And it's signed under the penalty of perjury, isn't that right?

A. Yes, sir.

Q. I see two signatures there. Whose are those?

A. Mine and my wife's.

Q. Did --

A. Go ahead.

Q. Did your wife sign it?

A. Yes. Let me explain to you --

Q. She actually signed it this time?

A. As I will tell you exactly

And I'm sure between July and November there was more -- there was more, what do you call it, there was more, what do you call it, research done by the lawyers, investigators, etcetera, so.

Q. **So as you say, you don't have you in the original complaint but you do have you in the current complaint? You're in eight but not seven, right?**

A. To my knowledge.

Q. **What is your understanding of what difference that makes?**

A. I am a plaintiff along with another party in objecting in -- to what happened with KVH stock and going, you know, suing as plaintiff the defendants.

Q. **Yes, but what difference does it make to put you in there as opposed to not having you in there?**

A. Okay. From when I'm told and understand I'm representing the secondary offering -- I'm not

IRVING S. BRAUN

representing, sorry. I am a plaintiff that bought stock in the secondary offering. Teamsters Affiliate Pension basically is a suit for open-market purchases.

Q. **And who are you suing?**

A. Mr. K, Mr. V, Mr. H and they have long Dutch names, and, you know, a couple of -- I think one or two other guys in management.

Q. **I didn't --**

A. And the company.

Q. **So how many people are you suing?**

A. Whatever the document says. To me it doesn't really matter because it's -- it's a company and they're financial officers.

Q. **And tell me in your own words to the best of your ability what are you saying that these people did wrong?**

A. It is my belief that when they knew -- excuse me, when they

IRVING S. BRAUN

should have known and advised the public of the possible forecasted sales of the product that they felt would enhance their bottom line and their company revenues wasn't going as planned, they should have made assertions to that in the secondary offering prospectus.

**Q. Have you completed your answer?**

A. Yes.

**Q. Is that as specific as you're able to be?**

A. For now, yes.

**Q. All right. Because now is your opportunity.**

A. I believe that's what I need to say.

**Q. Okay. Who are the other parties to the case that you haven't yet named in your answers to my questions?**

A. You want me to find the names?

IRVING S. BRAUN

Q. **Are you able to?**

A. There's Mr. van Heyningen, Patrick Spratt, okay. I thought there was a third guy. I may be wrong. All right, I'll look now. I thought it was three guys, so maybe I'm mixed up with the names here. It looks like it's just KVH Industries and the two gentlemen.

Q. **Who is Thomas Kukes?**

A. I don't recall, don't know.

Q. **What is Sekuk Global Enterprises?**

A. I was told that they were the original somehow party that started this. I'm not sure where they exact -- I think things were rolled up into a new type of case, I was told legally how that works. I asked that question myself yesterday, as a matter of fact. So being a layman I can't ask you because I specifically asked counsel, you know, what happened to Sekuk and they said it's all really rolled up

IRVING S. BRAUN

I don't know what that means.

Q. Because that's what you did in the IPO case.

A. I don't know what you're saying. I don't know what you're saying, I really mean that.

Q. All right.

A. Can you -- I don't know what you're saying.

Q. We'll just move on. Have you had any communications with any other attorneys in this case other than the ones you've named today?

A. No.

Q. Now, you are named as a plaintiff in the case, we've said that?

A. Correct.

Q. But are you also interested in doing more than just being named as a plaintiff?

A. I'm here to serve -- excuse me. I'm here to be deposed to show that I'm ready and willing to be a class representative.

IRVING S. BRAUN

Q. When did you decide that you were willing to be a class representative?

A. Basically I know that when I get involved in this, that sooner or later I have to possibly do that. So I know that pretty much, you know, from the git-go if it gets to that point, I need to be ready.

Q. Why did you decide that you were willing to be a class representative?

A. I just feel that, you know, it's time for people like myself, you know, the little guys, to get justice, that's all.

Q. You said that from the get-go you thought you'd have to be a class representative?

A. When I know that I'm putting myself as a plaintiff from my past experience, sooner or later that could arise as a possibility. I was asked for that with IPO fee. I was asked for

IRVING S. BRAUN

that in Merrill Lynch, which is seven years ago, so I really don't recollect.

I know once you get involved in this, you know, it can happen.

**Q. Who asked you to be a class representative this time?**

A. Nobody asked me in the sense that, you know, this hasn't been class certified. So I'm here to say that if it does I'm willing to do that. Curtis advised me this is -- you know, it's going to happen, that's it.

**Q. So it's Curtis Trinko who checked with you to see if you would be willing to be a class representative if necessary?**

A. Yes.

**Q. Okay.**

A. I know that from way back.

**Q. Because you know there's a lot of other plaintiffs here who aren't going to be a class representative; isn't that right?**

A. Could be.

IRVING S. BRAUN

Q. Could be or it is?

A. Yes.

Q. But you're interested in being one, right?

A. Right.

Q. Why?

A. I just feel that, like I said to you before, it's time for the little guys to get some justice, that's all.

Q. There's all these other guys like Slater and Vogel and Blomquist and Horner and Sernoff and Fung and Smith. Do you know those guys?

A. No.

Q. You don't know who they are?

A. No.

Q. Can you tell me what the class period is that you're alleging?

A. It was amended to October of 2003 I believe to July, sometime in July of 2004.

Q. Are you able to tell me why it was amended to that?

IRVING S. BRAUN

A. Why it was amended to that? No. I know it started out like January to July. Why? I can't remember why it was amended.

**Q. Would you say that the information you received about this case always comes from Curtis Trinko?**

A. Generally, yes.

**Q. Any exceptions?**

A. Generally yes. That's why I answered. It's coming from him, no.

**Q. How often does he give you information about the case?**

A. He sends me communications.

**Q. Does he send you letters?**

A. Yes.

**Q. How many letters has he sent you?**

A. He sends me the letters with the communications. Or he faxes it, then emails it, etcetera.

**Q. How often?**

A. I have some papers in my house. I don't know how often.

However -- let me step back, excuse me. I am notified by counsel as material -- I don't want to use that word. As important, what do you call it, important -- important -- come on, important happenings -- not happenings, I'm just drawing a blank. As important changes or occurrences, thank you, take place in this case.

Q. **How many times has that happened?**

A. I think, I think, again, I think I've gotten like about five, you know, five -- at least five, you know, emails and, you know, letters with the communications, etcetera.

Q. **Can you remember what any of those were telling you about?**

A. Yes.

Q. **What?**

A. They were telling me about -- they were telling me originally that -- about the case, okay. Then he told me about the

IRVING S. BRAUN

revised plaintiffs. Then he gave me the, you know, questions that you asked, questions that we responded to, etcetera, things like that.

Q. **How many meetings have you had with Curtis Trinko in this case?**

A. We had two, but most of our communications I said to you were over the phone or letters.

Q. **Does two include the one you mentioned earlier that lasted an hour and it was for this deposition?**

A. It includes, yes.

Q. **It includes that?**

A. Yes.

Q. **So you've had that and one other meeting with Curtis Trinko?**

A. Yes.

Q. **How long did the other meeting last?**

A. Also about an hour.

Q. **Was anyone else there?**

A. No.

Q. **Where was it?**

IRVING S. BRAUN

A. In a diner.

Q. When?

A. Oh, about two weeks ago.

Q. Did you know that there was a motion to dismiss the case?

A. Yes. It was denied.

Q. Did you read that?

A. Yes.

Q. Did you read the other papers opposing it?

A. I can't tell you that part. I don't recall.

Q. Did you read the ruling?

A. Whatever -- whatever Curtis has sent me I really look through.

Q. So you don't know if he sent you the ruling?

A. Right sitting here right now I can't tell you.

Q. Did you know there was an oral argument?

A. In front of the judge, yes.

Q. Did you go to that?

A. No.

IRVING S. BRAUN

**Q. Why not?**

A. Nobody told me.

**Q. What responsibilities do you understand that you have as a person who is named as a plaintiff and is willing to be a class representative?**

A. I have to be willing and able to meet with you and opposing counsel, anybody that might be there. I have to represent them so that when my lawyer gives me communications I have to review it and if I'm chosen to be a class rep, I have to make the decision what's right for the class -- for the class that they should get a, we, they, should get a fair ruling.

**Q. Do you understand the term fiduciary duty?**

A. Yes.

**Q. What does that mean?**

A. I believe it's a term that means that I have a -- fiduciary I believe is -- I don't know if it's synonymous, or that's a bad term

IRVING S. BRAUN

because I'm a layman, with, you know, monetary, that's involving a relationship of, you know, what do you call it -- let me rephrase that. It's a responsibility as a person who could be an agent to, what do you call it, be like a class rep. It's almost being, you know, a class rep has a fiduciary responsibility, they go hand in hand, that it's your job to do the right thing for everybody and be, you know, alert in, you know, and get the proper communications, etcetera.

**Q. And in that answer what do you mean by everybody? You said it's your job to do the right thing for everybody?**

A. Anybody who might be in the class.

**Q. Do you plan to commit your time and resources to this case leading up to the trial?**

A. Time, yes. Resources, if that's defined monetary, no.

IRVING S. BRAUN

Q. Okay. And have you made any estimates about how much of your time you are going to have to commit?

A. No, I haven't done that.

Q. Would you attend a trial in this case?

A. If I'm the class rep I have to, I suppose. If I'm told to, yes.

Q. And do you have any idea of where that would be?

A. Yes.

Q. Where would that be?

A. Rhode Island.

Q. Do you have any idea of how long that would last?

A. I have no clue yet.

Q. Are you sure you're going to be able to stay there all the time?

A. Look, I have -- as I say, when the time gets there I'll have to make arrangements somehow.

Q. You work full time?

A. Yes, sir.

Q. And --

IRVING S. BRAUN

A. I'm a salesperson.

**Q. And what kind of vacation do you get?**

A. Two weeks plus some PTO.

**Q. What's PTO?**

A. Personal time off.

**Q. How much of that do you get?**

A. I think like five or six days.

**Q. Now are you going to take your vacation and your PTO to be at the trial all the time?**

A. It's too early to presume anything.

**Q. What is your understanding of what your role would be at a trial?**

A. My role? If I'm called to testify, I'll testify. And if I'm not there to testify then I suppose I just have to listen and see if there's, you know, anything I hear that might be, you know, incorrect and advise counsel.

**Q. Would you expect to receive any compensation for spending that time**

IRVING S. BRAUN

**Q. So what is your motivation for being this class action representative?**

A. I've been wronged here and I believe in the past and I just want to see the little guys win, that's all. You know, that's it. That's the bottom line.

**Q. Are you having fun doing this?**

A. Fun? Oh, sure. You want to play Texas Hold 'Em, let's do something fun.

**Q. When did you first hear about KVH?**

A. Late January/early February 2004.

**Q. Are you complaining here about a specific product?**

A. Am I complaining about a specific product? I'm complaining about -- well the answer to that is to my knowledge, yes, but I'm complaining about a specific happening.

IRVING S. BRAUN

Q. Concerning a specific product?

A. Correct.

Q. What's that product?

A. It's a satellite antenna.

Q. Do you know the name of it?

A. I believe it's called the A5s.

Q. And do you know what that does?

A. Satellite antenna. Listen, I don't have one, but I see them around. I believe it just gives you better reception and things I'm saying. I get most of my stuff through cable, okay.

Q. Now, is it still on the market?

A. Is it still on the market? I believe it's still on the market but -- let me rephrase that. I don't know if it's still on the market or it's still in the warehouse, I'm saying, because I don't think it took

off and I don't think it's selling the way they expected it to. Just as a matter of fact the other day I was reading a thing on, you know, because things were getting close I saw something about KVH that they were being sued for patent infringement, I don't know if it was related to the satellite antenna, by a company in Minneapolis. So, you know, I know that your company, you know, doesn't exactly have a lot of good things going for it.

MR. WHITE: Well, for the record, there's no merit whatsoever to the plaintiffs' case.

Q. **Do you know who Martin A. Kits van Heyningen is?**

A. I believe he's the top dog.

Q. **Do you know who Patrick J. Spratt is?**

A. CFO.

Q. **And you're suing them, right?**

A. Well, we're suing the

company and them, and KVH, yes.

Q. So what do you think that Martin Kits van Heyningen did wrong?

A. As a CFO/CEO, it is their duty, their fiduciary duty to, you know, alert the public of possible sales, in this case, what do you call it, projections to be revised. You know, they -- we allege, allege, I don't know we, it's being alleged that they knew more about the product than they told about in the prospectuses and led the Street to know, you know, right before they went public, the secondary offering, that things, you know, weren't exactly as good as they alluded to and, you know, it would be the right thing to let people know, that's all.

Q. Now, we've looked at your amended complaint which has you in it as a plaintiff, which I think is Exhibit 8.

A. Yes.

Q. Are some of the factual

IRVING S. BRAUN

that question again, I don't think this is --

MR. GUNYAN: If you could rephrase it.

MR. WHITE: Just listen to it again, I think you'll like it better this time. Go ahead.

(Record read as requested.)

MR. GUNYAN: To the extent that he knows of a reason why he's already stated it on the record, and that is the release that he has mentioned that concerned negative earnings I believe the day of or the day before his sale. So that's already been stated in the record. I don't see any other reasons that you could get into other than --

MR. WHITE: It will be great if he can say that. I just want the witness to say that.

**Q. Do you know the reasons why KVH stock price went down during the days that you were holding it?**

IRVING S. BRAUN

MR. GUNYAN: Go ahead.

A. It went down because of the statements that your clients put forth on the night of the 19th or the morning of the 20th.

**Q. Do you have any other reasons in mind for the decline of KVH stock during the time that you held it?**

A. Not that I know of.

**Q. Can you be sure that there are no other reasons?**

A. I can't answer that. I don't know.

MR. WHITE: Why don't you try reading that again. Don't look at the attorney though, you have to answer yourself. Go ahead, read the question.

(Record read as requested.)

A. I can't -- your --

**Q. Can you be sure that there are no other reasons, yes or no?**

A. I can't be sure.

**Q. Okay, that's an answer, we can move on.**

A. I'm not God.

Q. Other than the possibility that you might win this case or might lose this case, you're also aware it could settle; is that right?

A. Oh, yes.

Q. Now have you been in on a case before as a party that settled?

A. Not yet.

Q. But you're aware of that phenomenon of settlement outside of court, right?

A. Yes.

Q. Who on the plaintiffs' side is going to decide whether to accept an out-of-court settlement of this case?

A. By all rights, legal counsel should come to -- if I'm a class representative and it gets to the settlement stage they should come to me and ask me if I think it's fair.

Q. And then you would decide?

A. Look, they have the expertise, I would rely on their

expertise to give them -- make them argue their case and if it makes sense, buy it.

MR. WHITE: I'm going to call for a short break if we can go off the record.

(A recess was taken.)

**Q. What was your role in In Re Merrill Lynch?**

A. What was my what?

**Q. Role.**

A. Role. Again, it's a long time ago so I don't know if I was setting -- being set up to be a class rep or I was just -- I know I was the plaintiff, a plaintiff, but I don't know if it was being class rep. I was being deposed.

**Q. Did you become the class rep?**

A. I believe the case was dismissed, it was thrown out. I don't believe, I know the case was dismissed, so I don't think it got that far.

# EXHIBIT C

<HELP> for explanation. N242 **Equity HP**

## Comp/CLOSE/PRICE

Page 1 / 3

KVH INDUSTRIES INC (KVHI US) PRICE 10.45 Q $ DELAYED

HI **22.849** ON **1/ 5/04**

Range 1/ 5/04 to 7/ 9/04 **Period** D **Daily** AVE **15.298** VL **481525**

USD Market T **Trade** LOW **9.39** ON **7/ 9/04**

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 7/ 9 | L9.39 | 264015 | F | 6/18 | 14.08 | 175559 | F | 5/28 | 13.46 | 290217 |
| T | 7/ 8 | 9.51 | 403165 | T | 6/17 | 14.18 | 145536 | T | 5/27 | 12.96 | 198594 |
| W | 7/ 7 | 9.85 | 580576 | W | 6/16 | 14.26 | 262809 | W | 5/26 | 13.00 | 285906 |
| T | 7/ 6 | 10.15 | 1921427 | T | 6/15 | 13.90 | 256624 | T | 5/25 | 12.73 | 152290 |
| M | 7/ 5 | | | M | 6/14 | 13.30 | 215368 | M | 5/24 | 12.65 | 127002 |
| F | 7/ 2 | 12.50 | 127797 | F | 6/11 | | | F | 5/21 | 12.75 | 215581 |
| T | 7/ 1 | 12.68 | 168591 | T | 6/10 | 13.34 | 244918 | T | 5/20 | 12.91 | 201903 |
| W | 6/30 | 12.83 | 269927 | W | 6/ 9 | 13.31 | 145982 | W | 5/19 | 12.55 | 464826 |
| T | 6/29 | 13.10 | 154472 | T | 6/ 8 | 13.28 | 137329 | T | 5/18 | 12.78 | 570781 |
| M | 6/28 | 12.92 | 295582 | M | 6/ 7 | 13.29 | 211237 | M | 5/17 | 12.95 | 589038 |
| F | 6/25 | 13.20 | 426206 | F | 6/ 4 | 12.90 | 273642 | F | 5/14 | 13.75 | 165854 |
| T | 6/24 | 13.20 | 507369 | T | 6/ 3 | 12.83 | 219600 | T | 5/13 | 13.47 | 172322 |
| W | 6/23 | 13.78 | 393618 | W | 6/ 2 | 13.01 | 244949 | W | 5/12 | 13.52 | 226280 |
| T | 6/22 | 14.30 | 1297584 | T | 6/ 1 | 13.28 | 166038 | T | 5/11 | 13.79 | 240595 |
| M | 6/21 | 14.04 | 215500 | M | 5/31 | | | M | 5/10 | 13.25 | 393521 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
H212-125-0 10-Jul-06 16:51:09

<HELP> for explanation. N242 Equity **HP**

**Comp/CLOSE/PRICE** Page 2 / 3

KVH INDUSTRIES INC (KVHI US) PRICE 10.45 Q $ DELAYED

HI **22.849** ON **1/ 5/04**

Range 1/ 5/04 to 7/ 9/04 **Period** D **Daily** AVE **15.298** VL **481525**

USD Market T **Trade** LOW **9.39** ON **7/ 9/04**

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 5/ 7 | 13.42 | 346909 | F | 4/16 | 13.06 | 275990 | F | 3/26 | 15.77 | 648146 |
| T | 5/ 6 | 13.73 | 274499 | T | 4/15 | 13.16 | 259680 | T | 3/25 | 16.40 | 1502398 |
| W | 5/ 5 | 13.79 | 330467 | W | 4/14 | 13.51 | 334239 | W | 3/24 | 14.07 | 146795 |
| T | 5/ 4 | 14.12 | 331978 | T | 4/13 | 13.48 | 354748 | T | 3/23 | 13.99 | 361051 |
| M | 5/ 3 | 13.79 | 571764 | M | 4/12 | 14.03 | 268845 | M | 3/22 | 13.74 | 328387 |
| F | 4/30 | 13.76 | 238264 | F | 4/ 9 | | | F | 3/19 | 13.96 | 341508 |
| T | 4/29 | 14.07 | 288128 | T | 4/ 8 | 14.33 | 255298 | T | 3/18 | 14.07 | 170446 |
| W | 4/28 | 14.66 | 437273 | W | 4/ 7 | 14.37 | 295454 | W | 3/17 | 14.60 | 238628 |
| T | 4/27 | 15.38 | 255890 | T | 4/ 6 | 14.85 | 198771 | T | 3/16 | 14.16 | 297333 |
| M | 4/26 | 15.43 | 259847 | M | 4/ 5 | 14.79 | 240290 | M | 3/15 | 14.18 | 201572 |
| F | 4/23 | 15.75 | 594326 | F | 4/ 2 | 14.52 | 310124 | F | 3/12 | 15.05 | 281584 |
| T | 4/22 | 15.81 | 1602697 | T | 4/ 1 | 14.52 | 348479 | T | 3/11 | 15.02 | 235173 |
| W | 4/21 | 13.33 | 317349 | W | 3/31 | 14.41 | 540069 | W | 3/10 | 15.51 | 219069 |
| T | 4/20 | 13.65 | 440165 | T | 3/30 | 14.25 | 1872153 | T | 3/ 9 | 15.82 | 299380 |
| M | 4/19 | 13.32 | 188936 | M | 3/29 | 15.84 | 381349 | M | 3/ 8 | 15.90 | 180726 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
H212-125-0 10-Jul-06 16:51:13

<HELP> for explanation. N242 **Equity HP**

## Comp/CLOSE/PRICE

Page 3 / 3

KVH INDUSTRIES INC (KVHI US) PRICE 10.45 Q $ DELAYED

HI 22.849 ON 1/ 5/04

Range 1/ 5/04 to 7/ 9/04 **Period** D **Daily** AVE 15.298 VL 481525

USD Market T **Trade** LOW 9.39 ON 7/ 9/04

| | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME | | DATE | PRICE | VOLUME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| F | 3/ 5 | 16.08 | 266662 | F | 2/13 | 18.45 | 838591 | F | 1/23 | 20.52 | 743447 |
| T | 3/ 4 | 16.68 | 175417 | T | 2/12 | 19.00 | 819088 | T | 1/22 | 19.54 | 696117 |
| W | 3/ 3 | 16.40 | 318319 | W | 2/11 | 18.83 | 1119976 | W | 1/21 | 19.51 | 303484 |
| T | 3/ 2 | 16.189 | 326867 | T | 2/10 | 19.99 | 2364011 | T | 1/20 | 19.64 | 453215 |
| M | 3/ 1 | 17.30 | 475868 | M | 2/ 9 | 19.13 | 893723 | M | 1/19 | | |
| F | 2/27 | 16.30 | 560453 | F | 2/ 6 | 18.73 | 408911 | F | 1/16 | 18.79 | 489293 |
| T | 2/26 | 16.57 | 804255 | T | 2/ 5 | 17.37 | 415657 | T | 1/15 | 18.92 | 1003938 |
| W | 2/25 | 15.46 | 355387 | W | 2/ 4 | 17.93 | 247788 | W | 1/14 | 18.24 | 319369 |
| T | 2/24 | 15.00 | 578925 | T | 2/ 3 | 18.70 | 537070 | T | 1/13 | 18.831 | 459230 |
| M | 2/23 | 15.41 | 1086745 | M | 2/ 2 | 19.74 | 408411 | M | 1/12 | 18.983 | 979829 |
| F | 2/20 | 15.21 | 2233235 | F | 1/30 | 19.54 | 191748 | F | 1/ 9 | 18.91 | 778725 |
| T | 2/19 | 17.15 | 990835 | T | 1/29 | 19.34 | 226502 | T | 1/ 8 | 20.639 | 902275 |
| W | 2/18 | 18.15 | 496695 | W | 1/28 | 19.25 | 514335 | W | 1/ 7 | 21.47 | 1078352 |
| T | 2/17 | 18.30 | 245327 | T | 1/27 | 20.65 | 325935 | T | 1/ 6 | 20.50 | 2271384 |
| M | 2/16 | | | M | 1/26 | 21.00 | 664655 | M | 1/ 5 | H22.849 | 1341957 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
H212-125-0 10-Jul-06 16:51:15